**WHITE STACK TOWING CORPORATION**, claimant-respondent, Appellant,

v.

**BETHLEHEM STEEL COMPANY, THE BETHCOAL NO. 1**, her gear, appurtenances, etc.,

and

**A/B Kronvik Shipping Co. O/Y**, as owners of **THE M/S BORNHOLM**, Appellees.

No. 8033.

United States Court of Appeals Fourth Circuit.

Argued March 21, 1960.

Decided June 1, 1960.

**420**

Donald M. Waesche, Jr., New York City (Baird, Crenshaw & Lanning, Norfolk, Va., Bigham, Englar, Jones & Hous-ton, Charles A. Van Hagen, Jr., New York City, and Guilford D. Ware, Norfolk, Va., on brief), for appellant.

John R. Sheneman, New York City (David H. Batchelder, Jr., Norfolk, Va., Zock, Petrie, Sheneman & Reid, Anthony N. Zock and James D. Hanlon, New York City, on brief), for appellee A/B Kronvik Shipping Co. O/Y.

Braden Vandeventer, Jr., Norfolk, Va. (Lord, Whip & Coughlan, Baltimore, Md., Vandeventer, Black, Meredith & Martin, Norfolk, Va., George W. P. Whip, Baltimore, Md., and Hugh S. Meredith, Norfolk, Va., on brief), for appellee Bethlehem Steel Co., as owner of the Barge Bethcoal No. 1.

Before SOBELOFF, Chief Judge, and SOPER and BOREMAN, Circuit Judges.

SOPER, Circuit Judge.

This appeal is taken by White Stack Towing Corporation, the owner of the tug Fort Moultrie, from a decree of the District Court in which it was adjudged that a collision in the Chesapeake Bay between the M/S Bornholm and the barge Bethcoal No. 1, in tow of the Fort Moultrie, was caused solely by the fault and negligence of the navigators of the tug. The judgment was rendered in two actions that were consolidated for trial.

In the first action A/B Kronvik Shipping Company, the owner of the Bornholm, brought suit against the Fort Moultrie and her owner, and against the barge and her owner to recover damages sustained by the ship. In the second action, Bethlehem Steel Company, the owner of the barge, brought suit against the ship, the tug and the owner of the tug, to recover damages sustained by the barge. By the final decree it was adjudged that the owner of the ship and the owner of the barge recover from the tug and her owner the damages sustained by their respective vessels, and that the libels of the owner of the ship and the owner of the barge against each other and their respective vessels be dismissed.

The owner of the tug does not challenge the conclusion of the District

Judge that her navigators were negligent in the operation of the flotilla but, nevertheless, contends that the sole proximate cause of the collision was the negligence of the pilot of the Bornholm in ordering her slow ahead and hard left when the barge came into view a few moments before the collision and, in the alternative, that negligence on the part of the navigators of the ship was a contributing cause of the collision.

The findings of fact by the District Judge, which are accepted as correct by the appellant on this appeal, may be summarized as follows. The Fort Moultrie, with the unmanned barge Bethcoal No. 1 laden with coal in tow, left the port of Norfolk, Virginia, bound for Baltimore, Maryland, at 2:15 P.M. on February 24, 1957. Upon entering the Chesapeake Bay the tug lengthened the towing hawser from 1000 feet to 1200 feet and thereafter did not shorten it before the collision which occurred in a fog the next morning at 7:57 A.M., about two miles off Point Lookout in the Chesapeake Bay, when the tug crossed the bow of the Bornholm from port to starboard and the forward starboard corner of the barge struck the port bow of the ship 4 feet aft of the stem.

In the meantime, the Bornholm, enroute in ballast from Wilmington, Delaware, to Norfolk, was proceeding down the bay in charge of a licensed pilot. At about 7:20 A.M., below Point-no-Point, when she was on course 162° T and making full speed of ten knots, she encountered fog which thickened until visibility was from 100 to 200 yards. A lookout was posted and the required fog signals were sounded. Shortly after 7:34 A.M. the pilot and the mate noticed an echo on the radarscope of the Raytheon CX 1002 Series 4R radar with which the ship was equipped. By changing the range of the instrument from 15 miles to 5 miles they were able to fix the object ahead, which later proved to be the Fort Moultrie, at a distance of 4¾ miles with a bearing of approximately 2° off the ship's port bow. At 7:36 A.M. they altered their course 8° to the right and reduced the speed of

the vessel to half ahead. At 7:46 A.M. the course of the ship was altered an additional 10° to the right to 180° T. At the same time the speed of the ship was reduced to slow ahead at 4 knots per hour. The radar then showed that the Fort Moultrie was bearing 22½° off the Bornholm's bow. About 6 minutes later, at 7:52 A.M., when the Fort Moultrie was at a distance of 1 mile, the echo disappeared from the radarscope.

At no time during these operations did the navigators of the ship attempt to obtain a radar plot so as to determine the course and speed of the tug. The evidence tends to show that the ship's radar had a minimum range of 100 yards and that, properly handled, it could be operated on 1½ mile scale so as to give a clearer picture of an approaching object than on a scale of 5 miles. The pilot, however, was unfamiliar with the radar set and it was left on at the 5 mile range and was not adjusted so as to have the minimum range of 100 yards.

The Fort Moultrie encountered the fog as early as 6:01 A.M. and thereafter sounded appropriate signals at regular intervals. No lookout was stationed either fore or aft. At 7:15 A.M. the echo of a vessel, which later turned out to be the Bornholm, was observed by the master of the tug on its radarscope bearing 2° to 5° off the starboard bow of the tug at a range of 7 miles. During the whole maneuver the radarscope was set at an 8 mile range and the master, keeping the echo under constant observation, believed that the vessels would clear starboard to starboard.

At about this time the fog signals of the Bornholm were heard from a position off to the starboard and were answered by the tug. The master believing that the vessels would pass starboard to starboard continued on the same course, which was then 333° T, without reducing the full speed of 4.5 knots per hour. The visibility at the time was 200 yards and the tug could have been stopped within one-half of this distance but she proceeded ahead and crossed the bow of the Bornholm from port to. starboard at a

distance of approximately 150 yards without seeing her. Shortly thereafter, at a distance of 50 to 75 yards, the master of the tug caught sight of the Bornholm at a point where he had anticipated that she would appear. The master then altered the course 20° to port and reduced the engines to slow ahead, and shortly thereafter felt a surge in the hawser and directed the tug toward the beach and anchored. It was just about this time that the collision occurred.

The navigators of the Bornholm heard the fog signals of the Fort Moultrie, consisting of one long and two short blasts, off the port bow, at 7:52 A.M. Immediately the engines of the ship were stopped and shortly thereafter, while she was dead in the water, the tug crossed her bow, port to starboard, and then appeared off the Bornholm's starboard bow at a distance of about 70 yards. In a few moments, while the ship was still dead in the water, the barge appeared out of the fog, about two or three points off the port bow. The ship's pilot thereupon ordered her engines slow ahead and her rudder hard left. He then ordered the engines stopped, slow astern, and half astern, in order to avoid the collision, but the collision occurred as above described, causing the damage to both vessels.

Upon this state of facts the District Judge reached the conclusion that there was no negligence on the part of the Bornholm, and if there was any error in her maneuvers immediately before the collision, it was an error in extremis and therefore excusable. As to the Fort Moultrie, he found neglect of the most glaring kind in her failure to shorten the hawser when good seamanship required it, in failing to maintain a lookout coupled with the improper and ineffective use of the radar, in failing to reduce speed when the fog became dense, and especially in proceeding at full speed through fog after hearing the signals of the ship toward the point where the master of the tug expected to find her. Since the errors of the tug cannot be denied we turn to her argument that, in spite of her mistakes, the collision was caused solely by the actions of the ship, or at

least that they were in part the cause of the collision. This argument rests upon testimony tending to show that if the Bornholm had remained stationary in the water or gone astern after the tug crossed her bow and unexpectedly appeared on her starboard side and after the barge had emerged from the fog and appeared less than 200 yards ahead of the ship, there would have been no collision. According to the navigators of the ship, the barge moved from three points on the port bow to dead ahead and thereupon, in the hope of avoiding a collision, they ordered the engines of the ship slow ahead and the helm hard left. The collision took place immediately thereafter. It may seem to those who calmly examine the evidence long after the collision occurred that it might have been avoided if the ship had not undertaken these maneuvers, or had gone astern, but it is manifest that the movements were taken under the stress of imminent danger in the exercise of the best judgment of the men in charge as to how a collision might be avoided, and hence there is presented the typical situation of action in extremis which abundantly supports the conclusion of the District Judge that under the familiar rule no liability should be imposed upon the ship. See The Ludvig Holberg, 157 U.S. 60, 70, 15 S.Ct. 477, 39 L.Ed. 620; A. H. Bull S.S. Co. v. United States, 2 Cir., 34 F.2d 614; Pacific-Atlantic S.S. Co. v. United States, 4 Cir., 175 F.2d 632, 640, certiorari denied 338 U.S. 868, 70 S.Ct. 143, 94 L.Ed. 532; Green v. Crow, 5 Cir., 243 F.2d 401, 403.

It is also urged upon us that the ship was negligent in not making efficient use of her radar. Expert testimony was offered by the tug to show that it is the practice of many of the largest merchant shipping companies in the United States to train their deck officers in the use of radar equipment and particularly in the use of the radarscope to plot the course of an approaching vessel whereby its course and speed may be ascertained. It was also brought out that the type and efficiency of the radar equipment in use varies greatly from ship to ship and

that the radar on the Bornholm was not as effective as sets of more recent date. As to accuracy, the manufacturer's claim for the set on board the Bornholm was that it could determine the range of a ship within 10 per cent of the distance and the bearing within 2° plus or minus. The evidence also indicated that the ship was not supplied with maneuvering boards which are needed for plotting and that the set was not properly operated by the ship's officers or the pilot so as to keep the approaching vessel in view.

Circumstances of this kind might well lead, in particular cases, to a finding of negligence and consequent liability. The use of radar in the navigation of ships is still in process of development and it has not yet become so standardized that its absence creates a condition of unseaworthiness. Moreover, it is quite clear that radar is not a substitute for other essential naval equipment and does not relieve the navigators from obedience to the official rules of navigation. It does not, for example, take the place of a lookout on the ship or justify the departure from the rules governing the management of the ship in a fog. It is nevertheless generally recognized that the failure of a navigator to make intelligent and reasonable use of dependable radar equipment which is furnished him to inform himself of the presence of an approaching vessel may be the foundation for a finding of negligence leading to liability. See Anglo-Saxon Petroleum Co. Limited of London, England v. United States, D.C.Mass., 88 F.Supp. 158; The Medford, D.C.E.D. N.Y., 65 F.Supp. 622; The Nora, [1956] 1 Ll.L.Rep. 617; Petition of United States, D.C.E.D.Va., 131 F.Supp. 712, affirmed sub nom British Transportation Commission v. United States, 4 Cir., 230 F.2d 139, affirmed on another point, 354 U.S. 129, 77 S.Ct. 1103, 1 L.Ed.2d 1234; Radar and Marine Collisions Today, 10 Hastings L.J.

To establish liability, however, from the negligent use of radar equipment a causal connection with a subsequent accident must be shown. In the pending case the District Judge found affirmatively that this connection had not been established. We agree with this conclusion. The Bornholm had knowledge from the signals of the tug that she had something in tow but no means of knowing the length of the hawser or the exact location of the barge. The admitted inaccuracies of the instrument and the unpredictable recklessness of the operators of the flotilla increased the posssibility of miscalculation, so that we cannot say with reasonable certainty that the most effective use of the set on the Bornholm would have enabled the ship to avoid the tug and its tow. It must be borne in mind that the gross fault of the tug imposed upon her the heaviest burden of proof. So far as the Bornholm is concerned, we are not dealing with a vessel which has disobeyed a settled rule of navigation and therefore must show, under the rule laid down in The Pennsylvania, 19 Wall. 125, 22 L.Ed. 148, that her delinquency could not have contributed to an ensuing collision. We are dealing with a ship which is defending herself against the attack of another vessel that has been guilty of the most glaring departures from the sailing rules. In such case the law laid down as follows in The City of New York, 147 U.S. 72, 85, 13 S.Ct. 211, 216, 37 L.Ed. 84, many years ago and still in force and effect is applicable:

"* * * Where fault on the part of one vessel is established by uncontradicted testimony, and such fault is, of itself, sufficient to account for the disaster, it is not enough for such vessel to raise a doubt with regard to the management of the other vessel. There is some presumption at least adverse to its claim, and any reasonable doubt with regard to the propriety of the conduct of such other vessel should be resolved in its favor. * * *"

See also Theothilatos v. Martin Marine Transp. Co., 4 Cir., 1942, 127 F.2d 1016, 1018.

That pronouncement is peculiarily appropriate to the conduct of the Fort Moultrie in the pending case.

It is hardly worthwhile to mention the tenuous argument of the appellant that actionable negligence should be attributed to the Bornholm because of the failure of her lookout to report the fog signals of the tug as soon as he heard them. The evidence tends to show that the lookout heard more signals than the pilot, from which the tug makes the questionable assumption that the lookout heard the signals before the pilot. The judge's finding on this point is, however, conclusive. He showed that the pilot and the mate of the ship knew that the tug was approaching long before the collision and that the Bornholm was dead in the water at all times when a report from the lookout would have been effective.

Affirmed.