**VILLANEUVA COMPANIA NAVIERA, S.A., owner of the Liberian S.S. Devon, Libelant,**

v.

**S.S. MATILDE CORRADO, her furniture, engines, tackle, apparel, etc., in rem, and "Corrado" Societa Di Navigazione, a foreign corporation, as owner and/or operator of said vessel in personam, Respondents.**

**"CORRADO" SOCIETA DI NAVIGAZIONE, owner and operator of the S.S. Matilde Corrado, Libelant,**

v.

**S.S. DEVON, her furniture, engines, tackle, apparel, etc., in rem, and Villaneuva Compania Naviera, S.A., as owner and/or operator of said vessel, in personam, Respondents.**

Nos. 8181, 8204.

United States District Court
E. D. Virginia,
Norfolk Division.

Dec. 31, 1962.

Vandeventer, Black, Meredith & Martin, Norfolk, Va. (Braden Vandeventer, Jr., and Hugh S. Meredith, Norfolk, Va.), for S.S. Devon.

Seawell, McCoy, Winston & Dalton, Norfolk, Va. (John W. Winston and Robert M. Hughes, III, Norfolk, Va.), for S.S. Matilde Corrado.

WALTER E. HOFFMAN, Chief Judge.

Actions *in rem* and *in personam* are pending by and between the owners of the bulk carrier DEVON and the owners of the Canadian liberty-type vessel MATILDE CORRADO. Each vessel claims that the other dragged anchor and drifted. A collision occurred on the night of January 24, 1958. For all practical purposes the only factual issue for determination is an inquiry as to which vessel dragged anchor. For reasons hereinafter stated the Court concludes that the MATILDE CORRADO was the offending vessel and appropriate decrees should be entered in these consolidated actions in admiralty.

The DEVON flies the Liberian flag and was, at all times pertinent hereto, owned by Villaneuva Compania Naviera, S.A., a Panamanian corporation. It is a bulk carrier of 10,545 gross tons and 6,341 net tons, with a keel length of 503 feet, and a beam of 66 feet 9 inches. At the time in question the DEVON had a draft of 7 feet forward and 18 feet aft.

The MATILDE CORRADO, flying an Italian flag, was, at all times pertinent hereto, owned by "Corrado" Societa Di Navigazione, an Italian Corporation. It is a Canadian liberty-type vessel of 6,965 gross tons and 4,197 net tons, approximately 424 feet 6 inches in length and 57 feet 2 inches in beam. At the time in question the MATILDE CORRADO had a draft of 6 feet forward and 15½ feet aft.

The MATILDE CORRADO arrived from Hamburg, Germany, in ballast and anchored in the James River off Newport News, Virginia, on January 17, 1958. Her starboard anchor was lowered with four shackles (60 fathoms) of chain in the water. The DEVON anchored in the James River on January 21, 1958, some four days later. She was in ballast at the time. Her port anchor was dropped with four shackles of chain out. Neither vessel purposely changed anchorage from the foregoing dates until the night of the collision.

Anchorage in the James River off Newport News is customary for vessels awaiting the loading of coal at the Chesapeake & Ohio Railway coal piers. In general, vessels anchor in two lines; one designated as the in-shore line, and the other referred to as the off-shore line. As may be expected, there is a sharp dispute as to where each vessel anchored. The MATILDE CORRADO contends that it anchored near the off-shore line on the evening of January 17 and on the following morning at 8 A.M. the dimensions were actually taken by means of sextant angles with the final position in line with the C. & O. building known as Pier 9. No precise record was made by the MATILDE CORRADO as to the place of anchorage, and the chart which was in use at the time was presented as evidence by proctors for the DEVON. This chart, before being marked by witnesses, did reveal two lines, one drawn from the TV tower, the other from the end of pier 9 at the C. & O. Railway. However the master of the MATILDE CORRADO testified that the point at which the two lines converge had no significance as to the place of anchorage. He places the initial spot of anchorage approximately 500 yards southwest of the intersecting point of the converging lines, and claims that following the collision the MATILDE CORRADO was approximately 300 yards south southeast from her

original point of anchorage. He places the DEVON's anchorage point at 400 yards east of MATILDE CORRADO's original point of anchorage, although he testified that the DEVON was "to the south part from my ship 300—400 yards south direction to the south-southeasterly direction."

■ There are many conflicts and inconsistencies in the testimony of the master of the MATILDE CORRADO. His evasiveness and denials with respect to obvious erasures in the log book—his categorical denial that the ship's engines were in use prior to the collision, despite testimony to the contrary from his third officer and inference to the contrary from the engine room log book made at 1950 on January 24, 1958, through which a line has been drawn reflecting this time to be 2140 (approximately 10 minutes after the collision) —all point to a definite lack of credibility. In short, the Court finds that the master does not have any definite impression as to where his vessel was anchored. The third officer was at least candid in that he admitted his lack of knowledge as to the place of anchorage.

The DEVON produced pilot Rutter of the Virginia Pilots Association who was aboard when his vessel anchored in the James River on January 21, 1958. He testified—after his memory was refreshed from a statement given a few days following the collision—that the DEVON anchored at a point approximately 1000–1100 yards southeast of Can Buoy "C1", at which time he observed the MATILDE CORRADO anchored to the east of the DEVON at a distance of about 900 yards. Rutter states that the DEVON was anchored in the off-shore line, and the MATILDE CORRADO in the in-shore line. This is substantially corroborated by the chief officer of the DEVON. The Court finds that prior to the storm on the night of January 24, 1958, the vessels were substantially in the positions as designated by pilot Rutter. Such a finding is not determined solely by the testimony of Rutter and others aboard the DEVON; the wind direction being such that it would be a physical impossibility for the vessels to be situated in the positions as described by the master of the MATILDE CORRADO and permit a conclusion that the DEVON had dragged anchor.

The impending storm on January 24 was known to be on its way. At 2000 hours the wind was blowing between force 3 and force 4. The wind continued to increase until immediately prior to the collision when it was blowing at an average velocity of 25 m. p. h., with gusts up to 45 m. p. h., and at the time of the collision it was raining and visibility was poor. The collision occurred at approximately 2130 or a few minutes thereafter. All of the credible evidence points to the fact that the wind was east to northeast, thus making the DEVON down wind of the MATILDE CORRADO.

Wind readings from official and semi-official stations at Norfolk Naval Base, Langley Field Air Force Base, Patrick Henry Airport and the Norfolk Municipal Airport all reveal either an east wind or east northeast wind between 1957 hours and 2203 hours. The master of the MATILDE CORRADO insists that the wind was blowing from the southeast or east southeast. He claims that the heading of his vessel was southeast.

The MATILDE CORRADO relies heavily upon the testimony of one Keith, now a rate and waybill clerk for the Chesapeake & Ohio Railway and, as of January 24, 1958, an assistant boat master at the C. & O. piers. On the afternoon in question Keith came on duty at 4 P.M. Forty-five minutes later he received word that the DEVON would dock that night between 8 P.M. and 9 P.M. as soon as a berth was available.[1] At 4:45 P.M. he noticed the DEVON lying offshore a little below Pier 9, and probably further offshore than any other vessel. Initially he indicated that he

---

1. The DEVON did not dock because of the storm.

had not noticed specifically where the MATILDE CORRADO was in relation to the DEVON but later expressed the view that the MATILDE CORRADO was anchored off Pier 8, with the DEVON being below Pier 9. As Pier 8 is further up the river than Pier 9, such positioning of the vessels, if correct, would place the MATILDE CORRADO upstream of the DEVON. He could not identify which ship was moving at the approximate time of the collision and did not notice either vessel thereafter. The witness Keith produced a wind log showing certain readings on the night in question, the weather vane being on top of Pier 8 and the dials from which the readings were taken being on the wall of Keith's office. The pertinent readings disclose the following:

4:00 P. M. – wind northeast, 22 m.p.h.
8:00 P. M. – wind east, 14–18 m.p.h.
9:40 P. M. – wind east, 25–40 m.p.h.
9:45 P. M. – wind east southeast, 30–44 m.p.h.
10:10 P. M. – 20 m.p.h.
11:00 P. M. – wind east southeast, 25–30 m.p.h.
12:00 P. M. – 20–25 m.p.h.

Keith did not know the type of instrument in use for the purpose of recording the wind velocity; he could recall no instance when anyone had ever serviced the equipment; he conceded that neither he nor any assistant boat masters were trained to read the instruments; he also indicated that there could be some variation in the wind direction and velocity when the wind was north northwest as some buildings may block the wind to some extent but with the wind coming from the water there would not be much difference.

As the collision occurred at approximately 2130 there is a sharp conflict between the testimony of the meteorologist from the United States Weather Bureau and the readings taken by Keith. Readings by Keith suggest that the direction of the wind at 2130, and for some minutes prior thereto, was either east or east southeast. The composite readings from the four official and semi-official weather stations point to an east or east northeast wind. As heretofore indicated, the Court accepts the latter version as to the wind direction.

From the foregoing statement of facts, the Court finds that the DEVON, on an easterly heading, was down wind of the MATILDE CORRADO. The Court further finds that the MATILDE CORRADO, by reason of the force of the wind, dragged anchor and drifted down wind, the stem of this vessel striking the starboard side of the DEVON near the forward part of the No. 1 hold.

No warning or signal was given by either vessel prior to the impact. Shortly prior to the collision, because of increasing winds, the DEVON slackened the anchor chain until seven shackles were down. Her engines were on stand by and the engine room personnel were on duty. The third officer was on watch and a seaman stood watch on deck. All proper anchor lights were burning.

To accept the testimony of the master of the MATILDE CORRADO would give credence to the impossible. Drawing 6 feet forward and 15½ feet aft, he would have the Court believe that he anchored in 15 feet of water. Moreover, the Court finds that this vessel commenced using her engines at 1950—the time of the original entry.

As the MATILDE CORRADO was the moving vessel and as there is insufficient evidence to establish an inevitable accident, the burden rests upon the MATILDE CORRADO to show fault on the part of the DEVON. The situa-

tion did not call for the entire crew of the DEVON to be on watch while at anchorage; a check of the anchor was made to determine whether she was dragging. It is true that no use was made of the DEVON's engines before the impact, but none was required until a matter of seconds prior to the collision when it was too late to take action. Much has been said as to the failure to produce as witnesses the master of the DEVON and the engine room personnel. Under another set of facts such failure could be fatal but, where the fault of the MATILDE CORRADO is clear, it is not enough to raise doubts as to the DEVON's management. White Stack Towing Corp. v. Bethlehem Steel Co., 4 Cir., 279 F.2d 419, 82 A.L.R.2d 757. Certainly the DEVON, under the circumstances here presented, was not required to act without an opportunity for the exercise of judgment. The Beaverton, 2 Cir., 273 F. 539; The Ceylon Maru, 4 Cir., 266 F. 396.

 The Court has previously expressed its views with respect to changes and erasures in log books. Skibs Aktieselskapet Orenor v. The Audrey, D.C., 181 F.Supp. 697, affirmed sub nom., Gratsos v. The Moisie Bay, 4 Cir., 287 F.2d 706. It is sufficient to state that an intentional falsification of material records presumptively destroys the weight of the offender's evidence as to the entire case. The master of the MATILDE CORRADO, who made the entries for the night of January 24, 1958, insists that there were no erasures but it does not require the services of an expert to conclude that erasures were made at the pertinent times noted. This is not to say that every erasure on a log book is fatal. Proctors for the MATILDE CORRADO point to erasures in the DEVON's log. Two minor changes do appear at the time of the collision entry but the gist of what happened appears to be a continuous entry made immediately after the collision. However, while the log erasures are persuasive, the case need not be determined solely on the fact that they were made. The Court does feel that such erasures, coupled with the master's denial that any were made, tend to destroy the credibility of the testimony given by the master of the MATILDE CORRADO.

There is some suggestion that at least a portion of the damage was occasioned by the efforts of the MATILDE CORRADO to free the vessels after the impact. As the MATILDE CORRADO is charged with the responsibility for the collision it matters not what may have occurred thereafter unless, of course, the DEVON was clearly at fault following the impact. As the evidence does not establish this fact, the MATILDE CORRADO must answer for all damages.

Adopting this memorandum in lieu of specific findings of fact and conclusions of law, pursuant to Admiralty Rule 46½, a decree may be presented containing an appropriate reference to determine damages.