**Robert MISTICH and Herbert Collette**

v.

**The M/V LETHA C. EDWARDS and the TUG ATHOS, Their Tackle, Apparel, etc., and Sterling Barge Line and Oil City Transportation Company.**

**No. 4740, Division D.**

United States District Court
E. D. Louisiana,
New Orleans Division.

July 5, 1963.

Phelps, Dunbar, Marks, Claverie & Sims, J. Barbee Winston, New Orleans, La., for libelants.

Terriberry, Rault, Carroll, Yancey & Farrell, Francis Emmett, New Orleans, La., for respondents.

AINSWORTH, District Judge.

This is a libel by the owners of the workboat MELROSE S against the M/V LETHA C. EDWARDS and the tug ATHOS and their owners, growing out of a collision after dark on March 27, 1960, in the Mississippi River near the right descending bank at Boothville, Louisiana. The MELROSE S, without tow, proceeding downstream, was in collision with the steel tank barge BUTANE in the flotilla being pushed upstream by the EDWARDS and the ATHOS. The MELROSE S was sunk as a result of the collision and became a total loss.

The EDWARDS was pushing two oil barges, the NAPTHA and BUTANE, in tandem, the latter being the lead barge and having a freeboard at her bow of

about 3 feet. The barges were laden with cargoes of crude oil and had a combined length of 522 feet. Made up along the port side of the barges BUTANE and NAPTHA was the tug ATHOS which was faced up to the barge SALVADOR, partially laden with oil. The head of the barge SALVADOR was approximately 30 to 45 feet aft of the port bow of the BUTANE. The MELROSE S was a wooden hull vessel about 50 feet in length; the ATHOS, a small tug of 45 feet in length; the EDWARDS, a large riverboat 95 feet in length; the SALVADOR, a barge 165 feet in length by 35 feet in width; the BUTANE and NAPTHA were 50 feet in width. At the time, according to its captain, the MELROSE S was proceeding about 150 to 200 feet off the right-hand bank or west side of the River at a speed of about 8 to 9 miles per hour and encountered patchy, low-hanging fog 8 to 9 feet above the water, although in places it was higher. The EDWARDS' captain said his flotilla was proceeding upriver, parallel to the west bank, about 200 feet off the bank, also encountering low-lying, patchy fog estimated as high as 10 feet in heighth. Visibility was therefore limited.

The testimony of the two helmsmen of the approaching vessels as to the manner in which the collision occurred is sharply contradictory. The MELROSE S's skipper testified that he saw an approaching white light of the EDWARDS a little to port estimated to be 700 to 1,000 feet away and sounded a one-whistle signal for a port to port passing. He stated that the approaching EDWARDS answered with a single blast, and then with two blasts, and that upon seeing that a head-on collision was about to occur, he turned the MELROSE S hard right toward the west bank of the River in an attempt to avoid the oncoming EDWARDS' flotilla but was struck by the port side of the lead barge BUTANE about midships of the port side of the MELROSE S. He was not sounding fog signals prior to the collision.

On the other hand, the captain of the EDWARDS contends that he saw the approaching lights of the MELROSE S coming downriver, parallel to the west bank, a little to starboard of his course, at a distance of 1 to 2 miles; that at the time the MELROSE S was showing red and green side lights and vertical white lights. Shortly thereafter he said a red light went out of view which indicated that the MELROSE S would pass to starboard of the tow. He said that when the MELROSE S was about one-half mile or less from the EDWARDS, he blew two short blasts for a starboard to starboard passing but that he heard no whistle signals of any kind from the MELROSE S. The MELROSE S held course off to starboard of the EDWARDS' tow until she was only several hundred feet ahead and to starboard of the BUTANE, at which time she turned hard right rudder and attempted to cross the bows of the barges BUTANE and SALVADOR. The ATHOS sounded four short blasts, the danger signal, and the EDWARDS and ATHOS both backed full astern but the port side was hit by the port corner of the BUTANE, sinking the MELROSE S. No fog signals were being sounded by the EDWARDS' flotilla prior to the accident.

It is impossible therefore to reconcile the testimony of the two helmsmen. Very little corroboration is given to their testimony by other crew members who testified, most of whom were not in position to observe and did not see the events which transpired before the collision. We believe this is a case of joint responsibility and that damages should be divided.

In our view this was purely and simply a case of a head-on collision between two approaching craft, the MELROSE S and the EDWARDS' flotilla.

■ Both captains were clearly at fault for operating their vessels in dangerous fog with severely limited visibility and without sounding fog signals which were necessary to warn of their approach. The ATHOS had joined the EDWARDS' flotilla a few minutes before the accident, having been tied up at Boothville because its skipper considered

the fog too dangerous to operate in alone. Significantly, the ATHOS' captain also testified he would have sounded danger signals in the fog but he felt this should be left to the navigation of the captain of the EDWARDS. The ATHOS, however, had been sounding fog signals prior to joining the EDWARDS. It is mandatory under Article 15 of the Inland Rules (33 U.S.C.A. § 191) that vessels proceeding in fog give prescribed signals. Neither vessel did so, and their failure constituted negligence.

Gilmore and Black on The Law of Admiralty (p. 399, § 7–3) emphasize that Rules of the Road are of extreme importance in the allocation of collision liability; that these rules are strictly and literally construed and compliance is insisted upon, citing Belden v. Chase, 150 U.S. 674, 698, 14 S.Ct. 264, 271, 37 L. Ed. 1218 (1893), and other cases.

Neither helmsman was keeping a proper lookout ahead; otherwise, this head-on collision would have been avoided. Both first saw each other a sufficient distance ahead to avoid an accident if they had been alert and turned off the collision course they were heading.

■ When the EDWARDS' skipper failed to receive an answer to his two-whistle blast for a starboard to starboard passing, he obviously did not know the intentions of the approaching vessel and he was therefore under an obligation to sound the danger signal and to take necessary precautions to prevent an accident. But he sounded no such signal as required by the Inland Rules (Article 18, Rule III) and his failure to do so also constituted negligence.

■ The EDWARDS' skipper was likewise at fault for failing to use his radar equipment, which was turned on and available to him, with a 2-mile range, and which would have indicated the position of the approaching MELROSE S in the fog. White Stack Towing Corp. v. Bethlehem Steel Co., 4 Cir., 1960, 279 F.2d 419, 82 A.L.R.2d 757. We do not accept his explanation that he did not need radar at the time. He said he could not tell before the accident that the MELROSE S was without tow. This fairly well shows how his visibility was impaired.

■■ It was likewise negligence for the EDWARDS to proceed as it did without having a prior agreement with the captain of the ATHOS, at the time of joining the flotilla, as to coordinating navigation. The EDWARDS' skipper said that the bearing of the MELROSE S from his position was constant as they approached, and the bearing did not change until the MELROSE S turned hard right. Where bearing does not change the risk of collision should be deemed to exist. See Inland Rules, Part IV, Preliminary—Risk of Collision (33 U.S.C.A. § 201). The EDWARDS took no special precautions during this constant bearing approach, and the failure to do so also constituted negligence.

By expert testimony respondents attempt to show that the turning circle of the MELROSE S is such that if it turned hard right immediately before the collision it must have crossed the starboard bow of the BUTANE and thereby brought about the collision solely through negligence of its helmsman. Testimony was given by a Naval architect to this effect, based, however, on certain assumptions which were not substantiated by the record. Assuming that the vessel struck when the MELROSE S was at a 90° angle to the approaching BUTANE, the witness said she would have had to cross from a position 131 feet to the starboard of the EDWARDS' flotilla; at 45°, she would have had to cross at a position 38 feet to starboard of the EDWARDS; and at 30°, 2 feet inboard of the starboard side of the 50-foot wide barge BUTANE. Respondents and their expert have failed to take into consideration the evidence that the bow of the barge SALVADOR, 45 feet back from the port bow of the barge BUTANE, was also in collision with the MELROSE S. The port rake corners of both the BUTANE and the SALVADOR were in collision with the MELROSE S. Under the circumstances it is unrealistic

to assume that the angle of the MEL-ROSE S at the time of collision was anywhere near 90°, and more reasonably it was nearer 30°, to be able to collide with the port bow of both barges. The rough sketch of the angle of collision drawn by the EDWARDS' skipper corroborates our view. The witness conceded that if the MELROSE S had collided with the barge at a 30° angle, the vessels would actually have been headed toward each other and that the MELROSE S under these circumstances would be some 23 feet to the starboard of the center line of the lead barge but still inside the starboard corner.

This is what we believe occurred; that the vessels were approaching on a head-on collision course and that neither attempted to do anything about avoiding an accident until a few seconds before the collision which then became inevitable.

An interlocutory decree therefore for libelants for divided damages will be entered.