MYSTIC STEAMSHIP CORPORATION,
Plaintiff,
v.
SS AMALFI, etc., et al., Defendants.

"ALCIONE" SOC. di NAVIGAZIONE per
AZIONE, Plaintiff,
v.
The OIL SCREW BETTY MORAN, SS
Amalfi, etc., Defendants.
Civ. A. Nos. 1315, 6392.

United States District Court
E. D. Virginia,
Newport News and Norfolk Divisions.
April 8, 1969.

Burlingham, Underwood, Wright, White & Lord, Robert B. Pohl, New York City and Seawell, McCoy, Winston & Dalton, Robert M. Hughes, III, Norfolk, Va., for Mystic Steamship in C/A1315 and Betty Moran in C/A6392.

Vandeventer, Black, Meredith & Martin, Morton H. Clark, Norfolk, Va., for Amalfi in C/A1315 and Alcione in C/A 6392.

## MEMORANDUM OPINION

KELLAM, District Judge.

During the early morning hours of August 7, 1967, the unmanned barge EASTERN NO. 3 (barge), in tow of the Tug BETTY MORAN (tug) collided with the Italian Steamship AMALFI (AMALFI) in dense fog about two miles north of Cape Henry.

Mystic Steamship Corporation (Mystic), the bareboat charterer and operator of the barge filed suit for damages against AMALFI and her owner "Alcione" Soc. di Navigazione per Azione (Alcione), [Civil Action No. 1315]. Thereafter, Alcione filed suit against the barge and Moran Towing Corporation (Moran), the owner and operator of the Tug BETTY MORAN [Civil Action No. 6392]. The actions were consolidated for trial.

AMALFI is a ship of 15,194 net tons, 756 feet long, with a beam of 98 feet.

On August 7, 1967, it was proceeding from Morrisville, Pennsylvania, to Norfolk, Virginia, drawing 18 feet forward and 22 feet aft.

The tug is 136 feet long by 35 feet wide, an uninspected tug, powered by twin diesel engines of 4300 combined horsepower. She was manned by a crew of seven, i. e., master, mate, two engineers, two deckhands, and a cook, with three men assigned to each six-hour watch.

The barge is a converted liberty ship, approximately 444 feet in length, 57 feet in width, which was loaded with approximately 13,000 tons of coal, drawing 27 feet 7 inches forward and 31 feet 6 inches aft. It was engaged in carrying coal from Norfolk to New York.

At 0125, August 7, 1967, the tug took the barge in tow at the Norfolk and Western coal piers, Lambert's Point, Norfolk, bound for New York. The barge was astern of the tug on a 1¼″ towing cable shackled into a 60 foot chain pendant running to the bow of the barge. The weather was clear and calm, and visibility was unlimited.

The mate of the tug was in the pilothouse in charge of navigation and the deckhand was with him as lookout. From the pilothouse the lookout had fast and reliable communication with the mate. Since the pilothouse was only 15 feet aft of, and somewhat higher than, the bow, the lookout's visibility there was better than from the bow. Two windows were open in the pilothouse.

Proper lights were displayed, the tug showing red and green side lights, three vertical white mast lights, and a white stern light, and the barge, red and green side lights and white stern light.

Off Sewell's Point the hawser was lengthened to ¾ of a cable, about 260 feet, and the flotilla entered Thimble Shoal Channel, with the tug's engines turning both shafts at 90 rpm, giving a speed over the ground of 8–9 knots with the 1½ to 2 knot following ebb current. The tug was and remained on automatic gyro steering. Its radar was operating on the 2 mile scale. An engineer was on watch in the engineroom.

When between Buoys 1 and 3 near the mouth of the Channel, fog rolled in suddenly, reducing visibility to about 500 feet and thereafter to less. Regulation fog signals at intervals of one minute were commenced by the mate, and continued until the collision.

As the tug cleared the mouth of Thimble Shoal Channel, engines were reduced to 50 rpm on both shafts, giving a speed through still water of 2½ to 3 knots and, with the ebb current, 4 to 5 knots over the ground. This was the slowest engine speed practicable. Further reduction would cause the air clutch to disengage from the shafts and there would be no propulsion. At the same time, course was changed to 100° T, said to be the customary course for an outbound tug and tow in either good or restricted visibility. Radar was switched to the four mile scale. Thereafter the tug and barge passed an unidentified vessel port-to-port in the vicinity of the Baltimore pilot boat.

The tug picked up on radar about 4 miles ahead a target (which proved to be AMALFI). After a few moments, the bearing appeared to broaden to starboard, and when the range was about 3½ miles the tug came left 10° to a course of 090° T, to give the vessels additional room to pass clear, starboard-to-starboard. The tug was unable to go further to port because of Buoy R"2", ahead and to port, marking shoal water to the north where the deep-draft barge would ground.

At 0304 hours AMALFI passed abeam of Buoy R"2" approximately ten (10) miles east-northeast of Cape Henry. At that point she altered course to 255° true maintaining a speed of approximately 15 knots. On the bridge of AMALFI in addition to the Master, were the First Mate, Second Mate and Third Mate, together with the Quartermaster. The Master was in charge of navigation and the Chief Officer was plotting the ship's position on the navigation chart. Vis-

ibility was approximately two (2) miles in fog and was getting worse. Standby engine had been given at 0300, and the AMALFI was sounding regulation fog signals. The boatswain was stationed on the bow of the ship. Radar was in operation. The AMALFI was following another vessel which was approximately three (3) miles ahead. The Virginia Pilot Boat contacted the AMALFI when she reached Buoy RB, and instructed her to proceed in to pick up her pilot.

At 0320 the AMALFI placed her engine on dead slow ahead, and at 0345 stopped her engine. At 0350 the AMALFI passed Buoy RB at a distance of six-tenths of a mile to starboard and altered course from 255° true to 288° true, to head in for the pilot station. At that time it made contact by phone with the pilot boat moored at a buoy 0.6 mile north of Cape Henry Lighthouse. The pilot boat directed AMALFI to proceed in to meet the pilot, who would board from a motor launch. AMALFI acknowledged it had the pilot boat on radar and would comply.

The Master of AMALFI said that at about 0350 he picked up a target on radar, bearing 15° to port, and which he said was in the mouth of Thimble Shoal Channel. The fact is, a bearing of 15° would have placed the target at about the location of the Virginia Pilot Boat.

At 0400 AMALFI was proceeding at a speed of dead slow ahead. When it reached the vicinity of Buoy R"2", it observed the tug on radar about ½ mile distant. It altered course further to the right to 330°. At the time of this change the AMALFI did not have proper knowledge, if any at all, of the course or speed of the tug. At about 0421 the AMALFI heard the tug's fog signal on the port side. It stopped its engines and the rudder was placed hard to right. At about 0423, the AMALFI spotted a group of white lights and a green light on the port bow at about 400 meters. AMALFI's engines were placed full astern.

At about the same time AMALFI spotted the tug, the tug spotted the lights of the AMALFI on the starboard bow, and as AMALFI came into view it was heading about 90° into the tug's tow course line. The tug's engines were ordered full ahead in the hope that the barge, which was following behind the tug, would also pass clear. This attempt was unsuccessful. AMALFI's bow struck the starboard bow of the barge causing the barge to heel to port. About ½ layer of towing cable paid out as the deckhand released the tension on the brake when he saw the sparks of impact. Collision occurred at 0425 tug time when the tug was about ¼ mile southwest of Buoy R"2" Horn, still on course 090° T and about 5-6 minutes after AMALFI's first fog signal was heard.

No maneuvering board plot was made by the tug of the radar sightings of the AMALFI. The tug said this would have required that the mate leave the radar, walk to the chart table, turn on a light and mark the target on the maneuvering board for each sighting plotted. It said the use of the light would have destroyed the mate's night vision. While one man can make a radar plot, it is a full time job.

No attempt was made by the AMALFI to keep a radar plot of the tug, although AMALFI was equipped with plotting sheets, had sufficient and qualified personnel available on her bridge for plotting and ample time in which to plot.

Had a plot been made, the AMALFI could have easily determined that its assumption that the tug was on a reciprocal course was incorrect and that whatever the situation was at the time of initial contact it had subsequently changed.

The purpose of the plot is for the radar operator to keep an accurate record of the range and bearing of targets in proper order so that he can estimate in advance how close a target would come to his ship, and to tell when the ship would reach a particular point. It would have shown the course of the tug. While

radar does not relieve the ship of the obligation to otherwise observe the rules, it is "generally recognized that the failure of a navigator to make intelligent and reasonable use of dependable radar equipment * * * to inform himself of the presence of an approaching vessel may be the foundation for a finding of negligence leading to liability." White Stack Towing Corp. v. Bethlehem Steel Co., 279 F.2d 419, 423, 82 A.L.R.2d 757 (4th Cir. 1960).

It likewise appears that after the AMALFI heard the fog signals of the tug it did not reduce its heading so that it could stop "within the distance she can [could] see another vessel with which she may be in danger of collision." Villain & Fassio E. Compagnia etc. v. Tank Steamer, etc., 207 F.Supp. 700, 706 (S.D.N.Y.1962), affirmed 313 F.2d 722 (2d Cir. 1963), (and cases cited). And as was said in the last cited case, a "blind alteration of course hard right to starboard, on a mere guess that she might thus avoid collision was clearly a fault." Here AMALFI made three course changes without knowing the speed, course or bearing of the tug. AMALFI admits it could have maintained steerage with its motors stopped.

However, the tug and barge were influenced by the flow of the tide and could not have further reduced speed and maintained steerage. If the tug's engines had been stopped, the barge would have been out of control and probably have overrun the tug.

 Even if the tug was negligent, this appears to be a proper case for application of the Major and Minor Fault Rule as set out in the case of City of New York, 147 U.S. 72, 85, 13 S.Ct. 211, 37 L.Ed. 84, and restated in Theothilatos v. Martin Marine Transp. Co., 127 F.2d 1016, 1018 (4th Cir. 1942), namely:

> "Where fault on the part of one vessel is established by uncontradicted testimony, and such fault is, of itself, sufficient to account for the disaster, it is not enough for such ves-

sel to raise a doubt with regard to the management of the other vessel. There is some presumption at least adverse to its claim, and any reasonable doubt with regard to the propriety of such other vessel should be resolved in its favor." See The Bright (The Hawaiian), 4 Cir., 124 F.2d 45, 47, 1942 A.M.C. 84, 88, decided recently by this Court, and cases therein cites. See, also, The Haven Belle, 4 Cir., 85 F.2d 939, 941.

Also see White Stack Towing Corp. v. Bethlehem Steel Co., supra [279 F.2d 419, 423].

While AMALFI says it had a lookout stationed on the bow, what he saw, if anything, is not shown, since he, was not produced as a witness.

 The evidence establishes that the cause of the collision in this case was the negligence of AMALFI and accordingly, liability is fixed upon it.