## THE NEWA.

## THE DJERISSA.

(Circuit Court of Appeals, Fourth Circuit. April 26, 1920.)

### No. 1768.

**1. Collision ⟜71(3)—Dragging anchor; failure to drop second anchor, on approach of storm, a fault.**

A collision between a vessel, which dragged her anchor in a severe windstorm, and another vessel, anchored a quarter of a mile distant, *held* due solely to the fault of the drifting vessel in neglecting to put out a second anchor until too near the other vessel to be of any avail, although the storm had been threatening for several hours.

**2. Collision ⟜22—Inevitable accident available as defense only to vessel without fault.**

To avoid liability for a collision on the ground of inevitable accident, a vessel must show that she was without fault.

**3. Collision ⟜69—Anchored vessel not bound to assume extraordinary risks.**

A vessel at anchor is not required to assume extraordinary risks to avoid the consequences of impending danger occasioned by the fault of another vessel.

**4. Collision ⟜73—Burden on moving vessel in collision with one at anchor.**

Where an anchored vessel has been run into by another, which dragged her anchor, the burden rests upon the latter to show that she had a proper watch, and that she discovered the dragging as soon as it commenced, and took proper measures to stop it.

Appeal from the District Court of the United States for the Eastern District of Virginia, at Norfolk; Edmund Waddill, Jr., Judge.

Suit in admiralty for collision by W. Paramor, Master of the British steamship Djerissa, against the steamship Newa; the Danish-Russian Steamship Company, claimant. Decree for libelant, and claimant appeals. Affirmed.

For opinion below, see 258 Fed. 949.

Leon T. Seawell, of Norfolk, Va. (Hughes, Little & Seawell, of Norfolk, Va., on the brief), for appellant.

Braden Vandeventer, of Norfolk, Va. (Hughes, Vandeventer & Eggleston, of Norfolk, Va., on the brief), for appellee.

Before PRITCHARD and WOODS, Circuit Judges, and WATKINS, District Judge.

⟜For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

PRITCHARD, Circuit Judge. [1] The learned judge who heard this case in the court below made the following clear and concise statement of the facts:

"About midday of the 11th of June, 1918, the Djerissa, a large ocean-going steamship, 350 feet long, 50 feet beam, 25 feet deep, was anchored in the waters of James river, Newport News harbor, about half a mile west of the Chesapeake & Ohio Railway passenger pier, and the Newa, also a large ocean steamship, 305 feet long, 43 feet beam, 23 feet deep, was anchored about 2 o'clock on the evening of the 12th of June, about a quarter of a mile to the westward of the Djerissa. While lying at anchor, about 9:30 on the night of the 12th of June, the Newa, in a sudden and violent storm, dragged into and collided with the Djerissa, causing serious injury to both vessels. The Djerissa relies on the negligence and failure of the officers of the Newa to exercise good seamanship in anchoring and handling their vessel; whereas, the Newa insists that she was without fault and that the accident was inevitable as a result of the violence of the storm, the dangers of which they could not reasonably have anticipated or provided against.

"Prior to and until a few minutes before the impact, the Djerissa had out her port anchor on 30 fathoms of chain, and the Newa her starboard anchor on 50 fathoms. Shortly before the storm, the Djerissa paid out 30 fathoms additional chain, and 15 or 20 minutes before the collision, and as the storm approached, dropped her starboard anchor on 45 fathoms of chain. The Newa, preceding the storm, had 50 fathoms on her starboard anchor, and paid out 35 fathoms additional, and about the time of the collision, but too late to be of service, dropped her port anchor on 45 fathoms. The harbor was comparatively free from conditions and obstructions likely to affect this collision. The tide had been running flood for about an hour, but that is not material here.

"Evidence of an approaching storm was apparent as early as 6 p. m. and the weather, accompanied by thunder and lightning, was threatening for two hours prior to the collision, although the wind did not reach high velocity until immediately preceding it. The Weather Bureau record at Norfolk shows that from 8:59 to 9:09 the wind blew from the southwest 18 miles an hour; from 9:09 to 9:15 at 20; at 9:27 it dropped to 19; from 9:27 to 9:29 it increased to 44 miles; from 9:29 to 9:30 to 68 miles; at 9:37 it dropped to 60 miles; at 9:38 to 58 miles; at 9:39 to 48 miles; at 9:41 to 35 miles; and gradually declined until 9:59, when it had dropped to 15 miles. Doubtless the velocity out in the harbor of Newport News was something higher than shown by these figures, one witness describing it at its height, for short periods, at 75 miles an hour.

"No question is made of the failure of the Newa to allow ample room to swing; nor is any denial made of the fact that she dragged into the Djerissa, and that the latter ship did not drag her anchor, nor do anything tending to bring about the collision, further than it is claimed she should have paid out anchor chain upon observing the Newa drifting into her, and thereby have lessened the violence of the impact; and the Newa relies solely upon this suggestion, and the fact that the collision could not have been avoided on her part by reason of the suddenness of the storm, as absolving her from responsibility for the accident."

The court below entered a decree in favor of the libelant in the sum of $17,205.97, from which decree the case comes here on appeal.

[2] The vital question involved herein is as to whether the Newa, the burdened vessel, has met the obligation upon her to show that she is entitled to the defense of inevitable accident. As the basis to this defense she must show that she is without fault, in order to escape liability. The Severn (D. C.) 113 Fed. 578; The Juniata (D. C.) 124 Fed. 861; The Fullerton, 211 Fed. 833, 128 C. C. A. 359; The Bertha (D. C.) 244 Fed. 319; The Barge No. 123 (D. C.) 250 Fed. 476.

The chief officer of the Djerissa, and a witness for the libelant, testified that he observed evidences of a storm about 6 o'clock. At 8 o'clock that night the captain gave his instructions for the anchor to be ready to let go. It further appears that the chief officer in turn gave that order to the carpenter. The chief officer, in referring to the condition of the weather that evening, said:

"I think she was lying a little northwest of us when our vessel was heading up stream and probably 1,500 feet off. We were still lying there on the night of June 12th at the same anchorage. We had just marked evidence of a storm brewing about 6 o'clock. I was on watch that evening from 4 until 8. The captain came on board that night about 8 o'clock. At that time there was not much wind. It was light atmosphere around at dark, and stormy looking sky. The captain gave me instructions for the second anchor to be ready to let go. That was at 8 o'clock. He gave me these instructions when he came on board. I gave that order to the carpenter. That precaution was taken on account of the storm; I saw it coming, and the barometer was very low. About 8:30 it seemed to be getting nearer all the time, but still had not come to us. At 9 o'clock it just started; the wind still higher at 9 o'clock.

" 'Q. How about at 9:10? A. It just probably at 9:10 to 9:20, just started.
" 'Q. You mean started hard at 9:10? A. Not the full force; it was gradually coming.'

"It was gradually coming from 8 o'clock on. At 9:20 the velocity of the wind was about 60 miles an hour; that was the time of the collision. The wind was coming from west, about west-southwest, I make it. Our vessel was light, and the other vessel was light."

The boatswain of the Djerissa said:

"The chief officer said to me to get the anchor ready; he said, 'You might be called on, and be ready.' He said, 'Stand by, you might be called;' and I was standing by the anchor—had it ready to drop."

The witness said this was about a quarter past 8. The boatswain also testified that he anticipated the storm was coming "between an hour and an hour and a quarter, or a half, to be exact."

The instructions of the master of the Djerissa to the chief officer were given about 8 o'clock, that the second anchor should be ready to let go, and, as we have stated, that order was given to the carpenter and the boatswain; the boatswain having received the order between 10 minutes and a quarter after 8 o'clock, just after the captain came aboard. It appears that these precautions were taken because of the appearances indicating a storm. At 8:30 the storm seemed to be getting nearer all the time, but had not reached the harbor.

The second anchor, with 45 fathoms of chain, was put out from the Djerissa between 10 and 20 minutes before the collision, and the ship came up on her anchor then. It appears that, when the second or starboard anchor was let out by the carpenter, the boatswain paid out additional chain on the port anchor, and the ship had come up on both anchors between 10 and 15 minutes before the collision. The boatswain, in referring to the conditions at that time, testified:

"I was called about 9:15, as near as I can judge, and the orders I got were, 'Stand by,' and 'Let go the second anchor.' I mean the starboard anchor. Then I went out and stood by the starboard anchor. The carpenter actually put out the second anchor between 10 and 20 minutes before the collision. He put out 45 fathoms of chain on the starboard, and the ship came up to the anchor then. When we let out the starboard anchor, we paid out on the port

anchor; it took 5 to 10 minutes to do that. Our ship had come up on both anchors between 10 and 15 minutes before the collision. I saw the other ship, and drew the attention of the mate, and said, 'It looks as if that ship was dragging.' There was a flash of lightning, and I could see everything. I could not see anything unless the lightning would flash up, and when the lightning would flash up I could catch a glimpse of everything. She was to our starboard then, her stern exposed to our starboard, between three to four ship's lengths away. I could see she was coming much closer than in the afternoon. We brought her up then. It was after we paid out 60 on the port and 45 on the starboard she came down. Her mainmast on our starboard side like that, and we went to the anchors again, and I stood by the starboard, and the carpenter by the port, and slacked away, according to what the captain and mate told us to do. The captain was there then. I first saw her several ship's lengths away. She looked to us then as though dragging, from the distance in the afternoon. I could not say what the other ship did then; I could see nothing. The next I saw of her she was on top of us, like that, on the port side, with her port beam here, and her port quarter. Her port quarter hit the port stem of our ship. She did not do anything then. We had to pay out cable. We slacked away the cable, and she veered up on the port side, and when she got immediately abreast she went astern, and then went ahead, and then seemed to be coming abreast, hit on top of us, and the captain shouted to him to look out for himself, and he went ahead, and she was cleared. When I started to slack the chain the second time, he was a quarter away across us."

While these precautions were taken by those in charge of the Djerissa, it appears, on the other hand, that the officers in charge of the Newa failed to take any precautions whatever. Indeed, their conduct indicates that they did not pay the slightest attention to any of the threatening signs and apparent indications of the approaching storm. It nowhere appears that the master of the Newa had any conversation with the mate about dropping the second anchor. The captain of the Newa, among other things, testified as follows:

"I was ashore that afternoon, and got back on the ship a little after 6. I had my supper on the ship, and from that time on I had a talk with the engineer, and gave the mate his orders. I ordered the engineer to have the engine ready at short notice, expecting to go alongside and commence loading at any time. When I went aboard it was windy, but no more than it had been all day long, and I did not expect it to be any worse. I did not observe any special phenomena at 8 o'clock. I can't say exactly the time the storm broke, but I think something about 9:15 or 9:20. At that time I was up in my room on the lower bridge, but I had both doors open. I always give the order to drop the second anchor to the second mate when we go into port, to have both anchors ready."

The chief officer admitted that that evening it looked like probably there was going to be a squall later on. It appears that he remained on his sofa until he was called by the watchman shortly after 9 o'clock, and it was blowing 60 to 70 miles an hour then. When he reached the deck, he found that the carpenter was ahead of him stationed at the port anchor, but had not let it out, and after the squall had struck an order was given by the chief officer to let the anchor go, inasmuch as the ship was taking an unusual sheer to port, which continued until she hit the other vessel. It is also in evidence that the carpenter had gone on deck because of the rate of the wind and the rain falling down the forecastle. The carpenter, among other things, testified as follows:

"Before I went out on deck, I was in the forecastle playing cards. I came out on deck because it was blowing so hard and raining down the forecastle; I went out to shut off the ventilator. I met the watchman on deck; he came from the chief officer's room, half way up to the forecastle head. I did not see the watchman coming out of the chief officer's room. I asked the watchman if he had called him, and he said, 'Yes.' The watchman had been to call the chief officer; I do not know where he was before that. This hurricane was on when I got out on deck. I cannot give the direction of the wind. It was raining hard; not so dark, but you could hardly see on account of the heavy rain. After I came out, I could see the ship swinging to port. The wind had caught the starboard side, and was shifting her to port quite fast. I cannot tell exactly how far she moved that way before we got the second anchor out; not very much; not a full ship's length; probably half, or a little over. When we got the second anchor out, it did not hold before we had out 45 fathoms of chain, and at that moment the Djerissa swung hard over against our ship. I do not know exactly when we stopped. The ship kept on going to port, but drifting at the stern; I could not tell. She did not stop until she got by the Djerissa. When I let down the second anchor, the watchman was attending to the anchor light. It was blowing out. After I came out, I estimate it was 5 or 6 minutes, probably a little more, before the collision. I am just estimating that."

The evidence clearly shows that, while the boatswain was not examined as to his diligence, the watchman was. Among other things, he testified that the lightning and thunder began about 7 o'clock, and that it was more or less lightning and thundering until after 8 o'clock. It does not appear that the watchman did anything until after he saw the wind hit the starboard side of the ship, at which time he notified the chief officer. The court below held that the putting out of the anchor at or just before the time of the collision was too late to be of any service.

[3] It appears that after the second anchor had been put out by the Djerissa, and the chain paid out on both anchors, and at the time the Newa was seen dragging down on the Djerissa, the chain was again slackened out in an effort to avoid the Newa. The vessel at anchor being the favored vessel, it is not required to assume extraordinary risks to avoid the consequences of impending danger occasioned by the other vessel's fault. In the case of The Juniata (D. C.) 124 Fed. 861, Judge Waddill, among other things, said:

"And besides the Sovereign of the Seas was not in a position—having herself made an improper anchorage—to call upon the Juniata to incur extraordinary risks in order for the Sovereign of the Seas to avoid the collision."

The lower court, in its opinion, referring to this point, said:

"The Newa cannot escape responsibility for her action by insisting that the other vessel should have pursued a different course looking to her own protection from the storm in which the vessels were caught. The latter vessel put out her second anchor, and the two held the ship. While it may be true that, if she had not done this, and had continued to swing on the single chain, she might have lessened the chances of the Newa dragging into her, still she might have been set adrift, and we would have two vessels running loose, instead of one. She selected the course that her navigators thought wisest for her safety, and she should not be held liable for not adopting a course conformable to the ideas of those navigating the other vessel."

According to the finding of facts of the court below, the threatening character of the weather was sufficient to have caused the Newa

to anticipate the coming storm, at least to the extent that it could have lowered the anchor and avoided the trouble that ensued. In other words, it was negligence for the Newa to fail to put out the second anchor, and pay out the proper amount of chain on both anchors, before the storm commenced. This is especially true, as in this instance, where indications of the storm had been apparent for some time before it commenced.

In the case of Barge 123, 250 Fed. 476, District Judge Morton, of the District Court of Massachusetts, said:

"Weather conditions were something the Llanberis was bound to notice and to take proper precautions against. The possibility that, if the wind should increase, she might drag a single anchor was evident. * * * When the gale came on, everything suggested the necessity of keeping a sharp lookout against dragging; yet her anchor watch entirely failed to observe that the steamer was doing so until too late for her to avoid fouling the barge. If they had noticed the danger in time, and had dropped the second anchor, the accident would have been prevented. Their negligence stands unexplained and unexcused. * * *"

Also in the case of The Terje Viken and The Baravia (D. C.) 212 Fed. 1020, Judge Waddill said:

" * * * Because of omissions on the part of the steamship to properly and timely perform her duty, as well in the manner of her original anchorage, as her neglect to take extra precautions in the face of the impending storm, * * * she should have anticipated the effect of the wind when she came to anchor, and have put out both anchors, * * * and as a matter of fact her port anchor was in the act of being turned loose when the collision happened. * * * Sight is not lost of the fact that the ship claims that the squall was so sudden that it was impracticable for her to cast the additional anchor in time to have been of use, had it been thought necessary; but the court thinks the evidence establishes the contrary to be the fact, and that ample warning of the approach of the storm was afforded, and additional precautions should have been taken to secure her safety, as was done by other shipping in the vicinity."

The court below found the facts, which, under the rule, should not be disturbed, unless clearly against the weight of the evidence. This rule is so well established that we do not deem it necessary to incumber this opinion with citations of authorities in support thereof.

[4] It is universally held that, when a vessel at anchor is run into by a moving vessel, the burden rests on the moving vessel. This rule is based on reason and is adhered to by all the courts. Where it appears, as in this instance, that the vessel at anchor has been run into, the burden is on the moving vessel to show that it had a proper watch on the deck, and that she discovered the dragging as soon as it commenced; that she took proper measures to prevent it, and that her ground tackle was sufficient. This rule is announced in Marsden on Collisions, p. 506.

It being found in this instance that the Newa is at fault, such fault is sufficient to account for the disaster, and it is not enough for her to raise a doubt as respects the management of the other vessel. An examination of the record discloses the fact that no fault was urged against the Djerissa in the lower court, and such contention has not been made in this court. In view of the facts as found by the court

below, and in the light of the law, such contention if made would be untenable.

From what we have said, it necessarily follows that the decree of the lower court should be affirmed.