**N. V. STOOMVAART MAATSCHAPPIJ, NEDERLAND v. WATERMAN S. S. CORPORATION, Inc. et al.**

**THE SALAWATI.**

**THE GATEWAY CITY.**

No. 136–201.

United States District Court
S. D. New York, Admiralty Division.

Jan. 18, 1949.

Subsequent Opinion April 27, 1949.

Burlingham, Veeder, Clark & Hupper, of New York City (Frederic Conger, of New York City, of counsel), for libelant.

Bigham, Englar, Jones & Houston, of New York City (Andrew J. McElhinney, of New York City, of counsel), for S. S. Gateway City.

John F. X. McGohey, U. S. Atty., and Louis E. Greco, Asst. U. S. Atty., of New York City, for the United States.

RYAN, District Judge.

This suit in the Admiralty grows out of a collision between the motor vessel Salawati and the steamship Gateway City in Gibraltar Harbor, on May 21, 1943.

The libel and complaint have been filed by N. V. Stoomvaart Maatschappij "Nederland", as owner of the Salawati against Waterman Steamship Corporation Inc., as owner, and the United States of America,

as requisition owner and operator of the Gateway City, to recover for the damage sustained by the Salawati.

At the trial, suit was discontinued by libelant against the United States of America.

Libelant is a corporation existing under the laws of the Kingdom of the Netherlands, having its principal place of business within this district. It was the owner of the Salawati which up to the time of collision was tight, staunch, strong and in all respects seaworthy. Respondent is an Alabama corporation having its place of business in this district. It was the owner of the Gateway City, a merchant vessel.

The Salawati is a motor vessel 420.9 feet long, 54.7 feet beam and 33.5 feet deep of hold; 8 cylinders 26¾ by 47¼. She arrived at Gibraltar Harbor on May 17, 1943. At 9:17 a. m. she was boarded by an official British naval pilot, proceeded under his pilotage to anchorage in the Bay of Gibraltar and anchored close to shore in an officially designated berth. Her starboard anchor was paid out in 32 fathoms of water, bearing of Europa Point 141 degrees, Carnero Point 188 degrees; draft forward 20½ feet, and aft 22½ feet. The Salawati remained in the same anchorage until after the collision.

The Gateway City is a steam turbin vessel 440 feet long. She arrived at Gibraltar Harbor on May 19, 1943, as part of a twenty ship convoy from Port of Oran, Africa. Upon arrival, an official British naval pilot boarded her and directed her to an officially designated berth where she anchored at about 10 a. m. The master of the ship protested to the pilot, objecting that the berth was too close to another vessel. The pilot refused to shift her to another anchorage, stating that he was without authority to change the location of the assigned anchorage. Later, on the same day, the master of the Gateway City communicated his objection to the British Naval Control Authorities, and a second official pilot came aboard and shifted the vessel to another berth where she dropped anchor in 15 fathoms and paid out about 45 fathoms of chain. This anchorage was at a point about 1,400 feet off shore just below Punto Mayorga. The Salawati lay close by about 6 points off the starboard bow of the Gateway City, forward of her beam. The Master of the Gateway again protested to the Naval Control about the proximity of the anchorage and requested a further change. This request for another anchorage was denied.

At the time, Gibraltar Harbor was crowded there being more than 75 vessels anchored there. The anchorages were assigned by the British Admiralty in such a way as to afford, in their judgment, the maximum protection from hostile aircraft, submarines and mines laid by small craft and swimmers.

The tidal flow inside the Strait causes a current to sweep into the harbor. The currents here are quite strong and without definite direction or trend; they are contrary and frequently run in a circular or rotary motion. They have a peculiar and varying character also occasioned by the irregularity of the bottom of the harbor, which varies in depth from 70 fathoms to shallow water.

On three or four occasions, following the afternoon of May 19, 1943 when the Gateway City came to anchor, she and the Salawati swung with the tide and currents in opposite directions clearing with ample leeway. It was not until the late afternoon of May 21, 1943, after more than 48 hours, that the vessels came in contact.

The weather was clear, the sun shining and there were no strong winds prevailing at the time.

Aboard the Gateway City on the afternoon of May 21, 1943, we find the following activities recorded by the second mate on the right-hand page of the rough log for that day: (libelant's Exhibit 6)

"4:50 ch, Eng. 2nd Mate tested and examined steering gear, telegraph, telephone, whistled Voice Tube. All in good order and condition 5:07 S.B.E. (stand by engines)

"5:33 Anchor up shifted anchorage Var. Bells

"6:45 Dropped Stbd anchor 4 shackles in Water

"6:50 F.W.E. (Finished with engines) Master conning."

The rough log was not produced by respondent and we had available on trial only a photostatic copy of the double-page log entries for May 21, 1943. Below this entry last quoted, we find, in the writing of the chief officer, a further notation as to the weather being "fine and clear," followed by his initials "J L M."

However, on the left-hand page of this log, recorded not by the chief officer, but by the second mate, the following entry appears: (libelant's Exhibit 6)

"4:50 p. m. This vessel swung at anchor (in ballast) collided with the stern of the S/S Salawati of the Netherlands Agents Timour & Co. (Port No. 4). One open double chock and one open single chock on stern of Salawati carried away, no further damage to Salawati. Upper strake of counter between stb chock and center chock at stern, sent inwards about 4 to 6 in. in several places on this vessel."

This entry is chronologically out of order and on the wrong side of the log. The second mate, who made this extraordinary entry, was not called as a witness by the respondent. This last entry is of special significance because it attempts to fix the time of the collision as 4:50 p. m. instead of 5:45 p. m. as contended by the Salawati.

It is here important to note that the engine room smooth log entry of the Gateway City of May 21, 1943 reads: (libelant's Exhibit 10)

"Shifting anchorage

"St. by 5:07 p. m. C 43212840

"F. W. E. 6:49 p. m. C 43214016

"Bells as per bell book."

This supports the entries on the right-hand page of the rough log of the Gateway City. The Chief Engineer was not called as a witness by respondent.

The following entry appears in the log of the Salawati for May 21, 1943: (libelant's Exhibit 4-A)

"8:00 a. m. everybody on duty.

"Performed various kinds of shipswork. At 5:45 p. m., the American steamship 'Gateway City', suddenly and swiftly swept around by the tide, came into contact with the stern of our ship on the port-side. Damaged were the railing, a Panama-chock

dislocated, a * * * chockroll broken off and the deck dislocated at the place of contact, also a deckbeam and stringer-plate bent in. We protested at once to the captain of the 'Gateway City,' which vessel had dropped anchor a few days after we did."

The placing of the time of the collision one hour earlier, fixing it at 4:50 p. m. instead of at 5:45 p. m., would take away all possibility of a causal connection between the collision and the shifting of anchor on the Gateway City. The Salawati contends that the collision occurred at about 5:45 p. m., when the Gateway City—drifting during shifting of anchor—was swept around by the tide and the currents; the Gateway City says that the collision occurred 43 minutes before the anchor was shifted and that it was occasioned by the currents or the tidal drift of the vessels, after the Gateway City had been placed in foul anchorage under compulsory pilotage.

The collision, whenever it did in fact occur, called for prompt action; an immediate need for shifting anchor was indicated. The Gateway City had steam available—the ship had turbine engines; Captain Orrell testified that it "required about twenty minutes to put it into condition for maneuvering;" Chief Officer Murphy fixed the time needed as "fifteen to twenty minutes." If we accept the version of the Gateway City her engines were not manoeuvred until 5:33 p. m.—43 minutes after the collision. This is improbable.

The very entries in the Gateway City's rough deck log belie the testimony that the collision occurred at 4:50 p. m. On the right-hand page of the deck log we note the entry that at 4:50 p. m. the chief engineer and second mate made a test and examination of "steering gear, telegraph, and telephone," and found all in good order and condition. It is highly improbable that a routine check of this nature was made simultaneously with or immediately after the collision. In any event, to have made these tests, the chief engineer would necessarily have been stationed in the engine room and the second mate in the pilot house; but the chief officer by his testimony puts the second mate on deck, just prior to the collision (which he placed at

4:50 p. m.), when he sent him to warn the master of the impending collision, and the master testified that he sent the mate forward to heave in the anchor chain just before the collision. This testimony does not agree with the log entries; it strikes a false note; it is incredible. And, again we observe that the second mate was not produced as a witness; nor was any satisfactory explanation offered by respondent for its failure to call either or both the chief engineer and the second mate as witnesses.

 It further appears that immediately following the collision the master of the Salawati caused a letter of complaint to be delivered to the Gateway City, to which he received a written reply signed by the master of that vessel. In his letter, Captain Orell of the Gateway City fixed the time of the collision as "Friday, May 21, 1943 at about 5:45 p. m." This recital of "5:45 p. m." as the time of the collision it is now urged is clearly a mistake because the letter further on states that "at 5:00 p. m. 5/21/43, this vessel commenced heaving anchor preparing to shift berth to prevent further contact with your vessel." This attempted explanation fails when we again refer to the entries of the Gateway City's rough log and find that there was no heaving of anchor until shortly before 5:33 p. m. The entry on the left-hand page of the rough log of the Gateway City and the testimony in support of it fixing the time of the collision as 4:50 p. m. are rejected as improbable and incredible.

The collision occurred at about 5:45 p. m. about twelves minutes after the anchor of the Gateway City had been raised and before she began manoeuvring with her engines.

 The Salawati at the time of the collision was having repairs made to her engines; it would have taken an hour for her to move; she was at anchor, at the same anchorage in which she had been placed on May 17, 1943, almost 48 hours before the arrival of the Gateway City. The Salawati was not required to take any extraordinary steps to move away from the Gateway City, giving her a foul berth. The Baltimore, D.C., 265 F. 409; The

Newa, 4 Cir., 267 F. 115. The collision was occasioned solely by the negligence of those in charge of the Gateway City, in her navigation from the anchorage in which she had been placed after her arrival in the harbor. This being so, it is unnecessary to consider what the liability of the Gateway City would be had the collision been occasioned by her swinging at anchor after having been placed in an improper berth by the compulsory pilot. The proximate cause of the collision was improper navigation and manoeuvring and not the place of anchorage. The Gateway City is held liable for the injury sustained by the Salawati.

Proposed findings and decree, in accordance with this decision, may be submitted on notice.