NEPTUNE MARITIME COMPANY OF MONROVIA, Plaintiff,

v.

The VESSEL ESSI CAMILLA, her engines, boilers, tackle, etc., in rem, and The Vessel MERCEDES MARIA, her engines, boilers, tackle, etc., in rem, Defendants.

NEPTUNE MARITIME COMPANY OF MONROVIA, Plaintiff,

v.

The VESSEL ESSI CAMILLA, her engines, boilers, tackle, etc., in rem, and Ruud-Pedersen, B.J., A/S, her owners, in personam, and The Vessel MERCEDES MARIA, her engines, boilers, tackle, etc., in rem, and Naviera Letasa, S.A., her owners, in personam, Defendants.

NAVIERA LETASA, S.A., Plaintiff,

v.

The VESSEL ESSI CAMILLA, her engines, boilers, tackle, etc., in rem, and Ruud-Pedersen, B.J., A/S, her owners, in personam, Defendants.

Civ. A. Nos. 80–1378–N, 80–1379–N and 81–222–N.

United States District Court, E.D. Virginia, Norfolk Division.

Feb. 2, 1982.

Guilford D. Ware, Crenshaw, Ware & Johnson, Norfolk, Va., for Neptune Maritime Co.

Carter T. Gunn, Vandeventer Black, Meredith & Martin, Norfolk, Va., for Naviera Letasa.

Vandeventer, Black, Meredith & Martin, Norfolk, Va., for Naviera Letasa and for M/V MERCEDES.

Peter W. Rowe, Stackhouse, Rowe & Smith, Norfolk, Va., and John H. Reilly, Jr., New York City, for B.J. Ruud-Pedersen and ESSI CAMILLA.

## MEMORANDUM OPINION

CLARKE, District Judge.

These actions are the result of collisions between the M/V ESSI CAMILLA, the M/V MERCEDES MARIA and the M/V NAIAD which occurred on December 25, 1980, in the Chesapeake Bay off Cape Charles.

Civil Action No. 80–1378–N is a suit by Neptune Maritime Company of Monrovia, the owner of the vessel NAIAD *in rem* against the vessels ESSI CAMILLA and MERCEDES MARIA for salvage services. Civil Action No. 80–1379–N is a suit by Neptune Maritime Company of Monrovia against the vessel ESSI CAMILLA *in rem* and Ruud-Pedersen, B.J./A.S., her owners *in personam* and the vessel MERCEDES MARIA *in rem* and her owners, Naviera Letasa, S.A., *in personam* for damages sustained by the NAIAD in its collision with the vessel MERCEDES MARIA. Civil Action No. 80–222–N is a suit by Naviera Letasa, S.A., owner of the vessel MERCEDES MARIA against the vessel ESSI CAMILLA *in rem* and her owners *in personam* to recover the damages sustained by the MERCEDES MARIA and also to assert a claim over against the ESSI CAMILLA for any sums Neptune Maritime Company of Monrovia might collect from the MERCEDES MARIA. The three cases were consolidated for trial. The issues of liability and damages were bifurcated. The liability phase of the case was tried on October 13 and 14, 1981. The question of damages is to be determined in a subsequent proceeding pending the outcome of the liability issue.

After hearing the evidence, the Court directed the parties to submit post-trial briefs addressing the factual and legal issues raised. The Court has received post-trial briefs and reply briefs from the parties, and the matter is therefore ripe for decision.

Accordingly, pursuant to Rule 52 of the Federal Rules of Civil Procedure, the Court makes the following findings of fact and conclusions of law.

On November 2, 1980, the NAIAD anchored at Cape Charles anchorage in the Chesapeake Bay, at the approximate position, Lat. 37° 12.5′ N., Long. 76° 04′ W. (Stip. FPTO). On December 11, the MERCEDES MARIA (MERCEDES) anchored in this anchorage at the approximate position, Lat. 37° 5.2′ N., Long. 76° 05.8′ W. (Stip. FPTO). On December 18, the ESSI CAMILLA (ESSI) anchored in this anchorage at approximately Lat. 37° 16′ N., Long. 76° 06′ W. (Stip. FPTO). On December 24, 1980, these vessels were still at anchor in approximately the same positions indicated above. There were thirty or more vessels in the Cape Charles anchorage on December 24. (Giannarakis Depo. p. 11).

The MERCEDES was anchored approximately three miles northwest of the NAIAD, and the ESSI was anchored approximately three-quarters of a mile north of the MERCEDES. (Tr. Exh. 21). At 0400 on December 25, the ESSI was anchored with nine shackles of chain out on her starboard anchor in water approximately one hundred feet in depth. (Tr. pp. 60–61, Hansen Depo. p. 9). The MERCEDES was anchored with seven and one-half shackles of chain out on her port anchor, in water approximately fifty feet in depth. (Tr. p. 61, Gonzalez Dep. p. 61). The NAIAD was anchored with seven shackles of chain out on her port anchor in water approximately thirty-four to thirty-six feet in depth (Tr. p. 61; Giannarakis Depo. 6–A, p. 35; NAIAD Ex. 25; MERCEDES Ex. 1). The place of anchorage was assigned to each of the vessels by the United States Coast Guard. (Tr. pp. 96–97).

The particulars of the three vessels at the time of the casualty were as follows (Stip. FPTO):

| | NAIAD | MERCEDES MARIA | ESSI CAMILLA |
|---|---|---|---|
| OWNER: | Neptune Maritime | Naviera Letasa, S.A. | B.J. Ruud-Pedersen, A/S |
| REGISTRY: | Greek | Spanish | Norwegian |
| LENGTH: | 228M(748′) | 275M(902′) | 262M(860′) |
| BEAM: | 32M(105′) | 39M(128′) | 41M(135′) |
| DRAFT: | 5.4(17′7″)Fwd 7.2M(23′7″)Aft | 37′ Aft | 27′ Fwd 27′ Aft |
| DEADWEIGHT TONS: | 72,059 | 115,000 | 119,500 |
| PROPULSION: (H.P.): | Diesel (20,000) | Diesel (23,200) | Diesel (24,800) |
| ENGINE MAKE: | Doxford | Sulzer | Harland & Wolff, Ltd. (Burmeister & Wain) |
| CYLINDERS: | 8 | 8 | 9 |
| BUILT: | 1975 | 1975 | 1976 |

The United States Weather Bureau forecast for the evening of December 24 and the morning of December 25 called for gale force winds of 25 to 40 knots. (Tr. pp. 59 and 161). The parties stipulated that the winds experienced on the Bay Christmas morning were accurately forecast (Tr. pp. 164–65). Sunrise was at 7:16 on the morning of the twenty-fifth (Tr. p. 59). The temperature was between 40 and eventually 30 degrees between midnight and 6:00 a.m. on December 25. (Tr. p. 59).

At approximately 0415 on the morning of December 25, the ESSI CAMILLA began to drag her anchor. (Stip. FPTO). Immediately thereafter, the Master of the ESSI CAMILLA, Captain Hansen, arrived at the bridge and called for the engine to be made ready to answer bells. (Hansen Depo. pp. 10, 11 and 47). He then sent the First Officer on the bow to drop the port anchor two shackles in the water. (Hansen Depo. p. 11). The vessel continued to drag after the port anchor was out. (Hansen Depo. p. 12). As she drifted, the ESSI was showing her "Not Under Command" light. (Mortensen Depo. p. 8).

At about 0430 the Master of the ESSI CAMILLA gave the engine room an order of full ahead, but the engine would not start. (Hansen Depo. p. 60). The engine could not be started because the necessary control air pressure was too low to turn the engine over. (Rolf Depo. p. 44; Anderson Depo. p. 32). Also, it was known that there was a crack in the housing of one of the engine's turbochargers, thereby making it more difficult to start the engine. (Anderson Depo. pp. 21–22 and 31; Tr. p. 49).

At about 0435, the Master of the MERCEDES MARIA, Captain Gonzalez, was advised that the ESSI's range was not remaining constant and that the vessel was approaching the MERCEDES. (Gonzalez Depo. p. 11). At this time, the ESSI was three-tenths of a mile away from MERCEDES. (Gonzalez Depo. p. 12). The Captain of the MERCEDES attempted to contact the ESSI on channel 16 on the VHF radio, the distress frequency. (Gonzalez Depo. p. 12, MERCEDES Depo. Exh. 23). MERCEDES heard no reply (Gonzalez Depo. pp. 12–13). The Captain of the ESSI heard MERCEDES, but attempted to reply on channel 12. (Hansen Depo. p. 55). MERCEDES signaled to ESSI with an Aldis flashing light, but received no response (Gonzalez Depo. p. 12; Gayoso Depo. p. 15). The Captain of the MERCEDES repeatedly sounded the danger signal (Gonzalez Depo. p. 12; Gayoso Depo. p. 14). There was still no response from ESSI (Gonzalez Depo. p. 12; Gayoso Depo. p. 16).

At 0435, the Second Mate on the MERCEDES told the engine room to be ready for maneuvering. (Gayoso Depo. p. 43; Berasateugui Depo. p. 8). The engines of the MERCEDES were ready for maneuvering sometime between 4:45 and 4:50 a.m. (Gonzalez Depo. p. 93).

At approximately 0455 or 0456, the port side of the ESSI CAMILLA collided with the bow of MERCEDES MARIA. (Hansen Depo. p. 13; Gonzalez Depo. p. 13). After the initial contact, the stern of ESSI swung in toward the starboard side of the MERCEDES until the ESSI was parallel to MERCEDES. (Gonzalez Depo. p. 13; M.M. Ex. 24). Prior to the second and third contacts, the ESSI suffered a steering casualty which caused her rudder to jam hard right. (Hansen Depo. p. 69). Subsequent inspection revealed that the steering problem was caused by a ruptured pipe in the port steering engine. (Hansen Depo. p. 72). Although there is some conflict in the testimony as to whether the engine of the ESSI was responding to full ahead immediately prior to the initial collision or immediately following the first impact, there is no disagreement that after the first impact, the ESSI CAMILLA's engine was going full ahead. (Hansen Depo. p. 59; Gonzalez Depo. p. 13; Gayoso Depo. p. 19; da Rocha Pires Depo. p. 7). The ESSI CAMILLA then moved forward into the wind and turned to port across the bow of MERCEDES MARIA, making additional contacts with MERCEDES MARIA at 0500 and at 0503. (Gonzalez Depo. pp. 13–16; Gayoso Depo. p. 18). A preponderance of the evidence indicates that as the ESSI proceeded across the bow of MERCEDES, the propeller or rudder of the ESSI became entangled in the port anchor chain of MERCEDES. (Tr. pp. 339, 343; Gonzalez Depo. p. 17; Gayoso Depo. p. 29). Thereafter, the two vessels began to drift in a southeasterly direction with the bow of MERCEDES linked to the stern of ESSI by MERCEDES' port anchor chain. (Tr. Ex. 11, Tr. pp. 64–65). It is undisputed that prior to the collision the MERCEDES was securely anchored and did not drag.

Immediately after the vessels began to drift, the MERCEDES was able to communicate with the ESSI on channel 16. (Gonzalez Depo. p. 18). The Captain of the ESSI requested that the MERCEDES drop its second anchor in order to stop the drifting of both vessels. (Hansen Depo. p. 74). The MERCEDES responded that it had its second anchor ready and asked to be advised as to when to drop it. (Hansen Depo. p. 74). The Captain of the ESSI then told his Chief Officer to veer the port anchor chain of the ESSI from two shackles to six shackles. (Mortensen Depo. p. 18; Tr. p. 279). As the ESSI attempted to let out more chain on her port anchor, the chain could not be stopped, and the ESSI lost the port anchor and chain overboard at 0525 (Tr. pp. 292–95; Hansen Depo. p. 76). At about 0530, the Captain of the ESSI asked the MERCEDES to drop her second anchor. (Hansen Depo. p. 75). The Captain of the MERCEDES, however, decided not to drop his second anchor for fear of losing it. (Gonzalez Depo. p. 19).

At 0555, in an attempt to free his ship from the ESSI, the Captain of the MERCEDES ordered his ship half-astern. (Gonzalez Depo. pp. 19–20). The brake on the anchor windlass had been released at this time. (Gonzalez Depo. p. 20). By going astern with the anchor windlass brake released, the two vessels increased the distance between them to a distance of approximately 100 meters. (Gonzalez Depo. p. 20). Although all thirteen shackles of chain ran out, the bitter end of the chain was securely fastened to the bulkhead of the chain locker and would not come loose. (Gonzalez Depo. p. 21). The second officer tried to release the bitter end with a sledge hammer, but the effort was unsuccessful. (Gayoso Depo. pp. 25–29). At 0600, the Captain of the MERCEDES ordered his engines stopped. (Gonzalez Depo. p. 22). Although, the record is not clear whether the effort to release the bitter end from the chain locker was made before or after the engine of the MERCEDES was stopped at 0600, a preponderance of the evidence indicates that the attempt to release the bitter end with a sledge hammer was made after the engine was stopped at 0600. (Gayoso Depo. pp. 25–29). The anchor chain could not be detached due to the high tension exerted by the anchor chain on the spike. (Gonzalez Depo. p. 22).

Meanwhile, at 0430, due to the heavy wind and seas, the Captain of the NAIAD

ordered dead slow ahead on his engine to ease the strain on his anchor chain. (Giannarakis Depo. 6–A, p. 11). It is undisputed that prior to the collisions the NAIAD was securely anchored and did not drag. The Captain of the NAIAD, by the reception of radio traffic, realized that a vessel was adrift in the Cape Charles anchorage at about 0530. (Giannarakis Depo. 6–B, p. 12).

Although there is some dispute as to the distance of the drifting vessels at 0530, the Court is persuaded by and accepts the testimony of Captain Barry, the expert witness for the NAIAD. Captain Barry testified that at 0530 the MERCEDES and the ESSI were approximately two and one-half miles from the NAIAD. (Tr. p. 106). Thereafter, the Captain of the NAIAD began a series of radar plots of the drifting vessels. After three radar plots, which took about twelve minutes, he was able to determine that the vessels were drifting toward the NAIAD. (Giannarakis Depo. 6–B, pp. 27, 30 and 37). At 0543, when the Captain of the NAIAD realized the danger of collision with two drifting vessels, he went hard starboard to allow the drifting vessels to drift down his port side. (Giannarakis Depo. 6–A, pp. 13, 33 and 52). At 0554, the Captain of the NAIAD had maneuvered out to starboard on his port anchor to a point where his anchor chain was tending abeam to port. (Giannarakis Depo. 6–A, p. 34; Malis Depo. p. 19). He then stopped his engines because of the strain on his anchor chain. (Giannarakis Depo. 6–A, p. 34). At this time, the ESSI and the MERCEDES were 100 to 500 meters away from the NAIAD. (Giannarakis Depo. 6–A, p. 34).

At approximately 0614, as the ESSI and the MERCEDES passed NAIAD to port at a distance of 30–40 meters, the NAIAD veered out two more shackles of anchor chain to provide a wider berth for the drifting vessels to pass clear. (Giannarakis Depo. 6–A, pp. 13 and 19; Malis Depo. p. 10). At 0615, the propeller or rudder of the MERCEDES caught upon the port anchor chain of the NAIAD pulling the two vessels together. (Giannarakis Depo. 6–A, pp. 14, 19 and 76).

At 0617, the Captain of the MERCEDES saw that his vessel was very close to the NAIAD. (Gonzalez Depo. p. 22). He gave an order for half speed ahead in an attempt to avoid a collision. (Gonzalez Depo. p. 23). However, the engine room advised him that they could not start the engine, probably due to an obstruction in the propeller. (Gonzalez Depo. p. 23). When he determined that his vessel's engine could not respond, the Captain of the MERCEDES ordered his second or starboard anchor dropped at 0625. (Gonzalez Depo. p. 26; Cobeaga Depo. p. 17). Meanwhile at 0619, the Captain of the NAIAD ordered his engines full ahead. (Giannarakis Depo. 6–A, p. 32). He was trying with his engines and a hard starboard wheel to keep the vessels apart. (Giannarakis Depo. 6–A, p. 32). At 0626 the stern of the MERCEDES came into contact with the port side of NAIAD. (Stip. FPTO). NAIAD slackened its anchor chain which then came loose from MERCEDES, and MERCEDES fell in alongside NAIAD with the starboard side of MERCEDES next to the port side of NAIAD. (Giannarakis Depo. 6–A, pp. 14–15). When the vessels reached the parallel position, the starboard anchor chain of MERCEDES was across the bulbous bow of the NAIAD. (Giannarakis Depo. 6–A, p. 15; Malis Depo. p. 12). After investigating the situation, the NAIAD stopped her engine at 0648. (Giannarakis Depo. 6–A, pp. 15, 58; NAIAD Depo. Ex. 12). At 0745, the NAIAD went full ahead on her engine. (NAIAD Depo. Ex. 12; Giannarakis Depo. 6–A, p. 15).

At approximately 0800, the MERCEDES, which had not requested any assistance from NAIAD, took the end of two wire cables that were passed over from the NAIAD, and the vessels were then secured together with the port side of NAIAD next to the starboard side of MERCEDES. (Giannarakis Depo. 6–A, pp. 20, 62, 66; Cobeaga Depo. p. 33).

Shortly after noon on December 25, pilots came aboard the ESSI and the NAIAD. (ESSI Depo. Ex. 12–A; NAIAD Depo. Ex. 1). The NAIAD then retrieved her lines from the MERCEDES MARIA, raised her

anchor and departed under her own power to another anchorage. (Giannarakis Depo. 6–B, pp. 15–17). Later in the afternoon, the ESSI sent crewmen over the side to burn the anchor chain of the MERCEDES from the propeller of the ESSI, thereby freeing the vessels from their entanglement with one another. (Tr. p. 274; Mortensen Depo. pp. 13, 14 and 21).

 The law is clear that there is a presumption of fault on the part of a vessel which drags anchor and collides with another anchored vessel. *The Oregon,* 158 U.S. 186, 15 S.Ct. 804, 39 L.Ed. 943 (1895); *The Louisiana,* 70 U.S. 164, 18 L.Ed. 85 (1865); *The Newa,* 267 F. 115 (4th Cir.1920); *Villanueva Compania Naviera S.A. v. S.S. Matilde Corrado,* 211 F.Supp. 930 (E.D.Va. 1962); Griffin, *The American Law of Collision,* § 156 (1949). To rebut this presumption of fault, the burden is upon the moving vessel to show affirmatively that the collision was the result of inevitable accident which human skill and precaution and a proper display of nautical skill could not have prevented. *United States v. South Carolina State Highway Dept.,* 171 F.2d 893 (4th Cir.1948); *Willis v. Tugs Tramp and Mars,* 216 F.Supp. 901, 903 (E.D.Va.1962). Further, where more than two vessels are involved in an anchor dragging incident, the vessel which originally dragged is liable for damages in subsequent collisions. *Griffin, supra* at 370. However, the second vessel, if not at fault for the original collision, is not liable for the later ones, unless she could have taken action to prevent her own dragging. *Id.*

In the present case, the ESSI has made no showing that the initial collision was the result of inevitable accident. In fact, the ESSI has acknowledged fault in the initial collision between the port side of ESSI and the bow of MERCEDES (Tr. p. 193). At trial, the ESSI conceded negligence in failing to have her engine ready at an earlier time. (Tr. p. 192). Moreover, the Master of the ESSI, Captain Hansen, admitted at trial that had the main engine been ready to maneuver when the vessel first began to drag, the subsequent collisions would not have occurred (Tr. p. 343).

Although the ESSI has admitted her fault in the collisions, she contends that the MERCEDES and the NAIAD are also at fault in that:

(1) The MERCEDES was negligent in taking no steps to avoid the ESSI when the ESSI dragged her anchor and closed the distance between the ships.

(2) The MERCEDES was negligent in failing to slack off the vessel's anchor chain or slip its anchor when the vessels were side by side after the port side of the ESSI collided with the bow of the MERCEDES.

(3) The MERCEDES was negligent after the vessels became entangled in failing to disconnect the port anchor chain of the MERCEDES thereby freeing that vessel from the ESSI.

(4) The NAIAD was negligent in failing to take sufficient steps to avoid collision with the MERCEDES.

Both the ESSI and the MERCEDES deny that the NAIAD is entitled to a salvage award.

It is undisputed that the MERCEDES was properly anchored and did not drag prior to the initial collision. It is also undisputed that the NAIAD was properly anchored and did not drag prior to the collision with the MERCEDES. Insofar as the fault of the ESSI CAMILLA is clear and undisputed in these consolidated actions, the ESSI has the burden of establishing that either the MERCEDES or the NAIAD should be held at fault for the collisions. As stated in *The Oregon,* 158 U.S. at 197, 204, 15 S.Ct. at 809, 811:

> . . . where one vessel clearly shown to have been guilty of a fault, adequate in itself to account for the collision, seeks to impugn the management of the other vessel, there is a presumption in favor of the latter, which can only be rebutted by clear proof of a contributing fault. This principle is peculiarly applicable to the case of a vessel at anchor, since there is not only a presumption in her favor, by the fact of her being at anchor, but a presumption of fault on the part of the

other vessel which shifts the burden of proof on the latter.

█ However, it is also well settled in the cases of collision that the initial fault of one vessel does not exempt other vessels from the duty of complying with the rules of navigation, or of using such precautions as good judgment and seamanship require to meet the emergency. *The Yoshika Maru,* 20 F.2d 25 (9th Cir.1927); *The Baltimore,* 283 F. 728 (1st Cir.1922). Therefore, if a vessel at anchor in a gale could reasonably avoid a collision threatened by another vessel, and does not adopt the means for doing so, she is likewise at fault and must abide the loss with the other vessel. *The Sapphire,* 78 U.S. (11 Wall) 164, 20 L.Ed. 127 (1871); *The Tungus,* 5 F.2d 66 (2d Cir. 1925).

However, it is not sufficient for the ESSI to cast a doubt on the management of the MERCEDES and the NAIAD. *The Oregon, supra* 158 U.S. at 204, 15 S.Ct. at 811. Rather, the evidence must be clear. *Id.*

### THE MERCEDES MARIA

The ESSI contends that the MERCEDES is at fault for failing to take certain actions prior to the initial collision. For the following reasons, the Court FINDS that the ESSI has failed to meet its burden of proof regarding these contentions.

█ An anchored vessel is entitled to rely on moving vessels to keep clear of her, and her first duty is to remain at rest and to give the moving vessel every opportunity to avoid her. *Griffin, supra* at 371. If the anchored vessel can mitigate or avoid the collision and fails to do so, she is at fault. *Id.* However, "[t]he vessel at anchor being the favored vessel, it is not required to assume extraordinary risks to avoid the consequences of impending danger occasioned by the other vessel's fault." *The Newa,* 267 F. 115, 119 (4th Cir.1920). Furthermore, an anchored vessel is not required to keep steam up so as to be able to move away suddenly. *The Charles Hubbard,* 229 F. 352 (6th Cir.1916). Moreover, even if the vessel placed *in extremis* commits errors of judgment, her actions will be judged le-

niently. *Union Oil Co. v. Mary Malloy,* 414 F.2d 669 (5th Cir.1969); *White Stack Towing Corporation v. Bethlehem Steel Co.,* 279 F.2d 419 (4th Cir.1960).

The ESSI contends that the MERCEDES could have avoided the initial collision by raising her anchor and moving out of the path of the ESSI. However, the Court is persuaded by the testimony of Captain Cushman, the expert witness for the MERCEDES, that there was not sufficient time for such a maneuver. Captain Cushman testified that it takes an average of four to four and one-half minutes in normal weather for each shot of chain to be hauled in on the MERCEDES. (Tr. p. 232). Prior to the collision, the MERCEDES was anchored with seven and one-half shackles of chain out on her port anchor. At 0435, when the Captain of the MERCEDES was first advised that the ESSI was drifting in his direction, the ESSI was three-tenths of a mile from MERCEDES. The Court is of the opinion that the evidence in the record does not support a finding that the MERCEDES was negligent in failing to determine prior to 0435 that the ESSI was drifting in her direction. The Court is also of the opinion that at 0435, when the Captain of the MERCEDES was first advised that the ESSI was drifting in his direction, there was not sufficient time for the MERCEDES to heave up her chain. Further, such action could have resulted in injury to the crew members of the MERCEDES if the collision occurred before the MERCEDES had her chain up. (Tr. p. 232).

The ESSI further contends that the MERCEDES could have veered her anchor chain and thus avoided the collision with the ESSI. However, the Captain of the MERCEDES stated that he did not slacken his chain for fear of losing his anchor. (Gonzalez Depo. p. 85). The Court gives credence to this explanation as the ESSI lost her port anchor in a similar attempt on the morning of December 25 (Tr. p. 279). Further, even if the attempt was successful, there is a possibility that the collision would have occurred, but at a different location. (Gonzalez Depo. p. 85). Moreover, such a

maneuver would have decreased the distance between the MERCEDES and an unidentified vessel anchored approximately six-tenths of a mile from the stern of MERCEDES, thus further enhancing the possibility that a collision would occur.

It is also contended that the MERCEDES could have used her rudder to avoid the path of the drifting ESSI. However, given the conditions of wind and sea which existed on December 25, such a maneuver by the MERCEDES MARIA would have opened her bow to the wind and greatly increased the pressure of the wind against her hull, thus endangering the set of her anchor and increasing the possibility that the MERCEDES would also drag her anchor. (Tr. pp. 248–252).

Finally, the ESSI contends that the MERCEDES could have avoided the initial collision by slipping her anchor and moving out of the path of the ESSI. However, the Court is of the opinion that the reluctance of the MERCEDES to undertake such a maneuver does not establish fault on the part of MERCEDES given the time element involved, the number of other vessels in the crowded anchorage, the weather conditions, and the absence of a pilot familiar with the waters on the MERCEDES MARIA. (Tr. pp. 156–57, 220 and 226).

Although the ESSI has presented the Court with various possible courses of action which it asserts the MERCEDES could have taken to avoid the initial collision, the Court remains unconvinced that any were viable given the risks inherent in each and the circumstances which existed prior to the initial impact. Although the ESSI relies on the *The Tungus,* 5 F.2d 66, 67 (2d Cir.1925) in support of its position, the Court FINDS the later case is inapposite in that there was not "ample time for due consideration and caution" in the case at bar prior to the initial collision. Furthermore, as noted previously, the MERCEDES repeatedly tried to contact the ESSI prior to the initial collision, but received no response. It was reasonable to expect that the ESSI would discover she was drifting, come ahead on her engines, and steer clear of the anchored MERCEDES. Accordingly, in light of all of the circumstances surrounding the initial collision, the Court FINDS that sole liability for the initial collision between the ESSI and the MERCEDES rests with the ESSI.

The ESSI contends that the MERCEDES is at fault following the initial collision for failing to take certain actions. First, the ESSI contends that the navigators of the MERCEDES were negligent in failing to slack off the vessel's anchor chain or slip its anchor when the vessels were side by side after the port side of the ESSI collided with the bow of MERCEDES. The Court is of the opinion that the evidence does not support such a finding. As noted previously, there is no disagreement that after the first impact, the ESSI's engine was going full ahead. The Captain of the MERCEDES stated that he could see clearly that the ESSI was going ahead with its engines at the time the vessels were in a parallel position. (Gonzalez Depo. p. 13). Therefore, the Court FINDS that the MERCEDES was not at fault for failing to take action at this time. It was reasonable to assume that the ESSI would avoid further contact at this point by the use of her engines. MERCEDES had no reason to know at that time the ESSI's rudder was jammed hard to starboard. Moreover, the Court FINDS it is more likely that further damage would have been avoided if the Captain of the ESSI had stopped her engine when he learned that the rudder of the ESSI was stuck hard to starboard. (Tr. pp. 235–36 and 336–43).

Next, the ESSI contends that the navigators of the MERCEDES were negligent in failing to disconnect the port anchor chain thereby freeing that vessel from the ESSI. As noted earlier, from 0555 to 0600 the MERCEDES went astern in an effort to jettison the chain. The Captain of the MERCEDES stated that he did not attempt such a maneuver earlier because of the proximity of other vessels in the crowded anchorage. (Gonzalez Depo. p. 22). At 0555, when he observed that it was safe to do so, he gave the order to go astern. (Gonzalez Depo. pp. 120–21). The attempt to

jettison the chain, however, proved unsuccessful due to the strain on the chain. Although the ESSI contends that the MERCEDES was negligent in not having released the bitter end of the port anchor chain before going astern, the evidence shows that from 0535 to 0557 ESSI was going ahead on her engines, thus creating a strain on MERCEDES' anchor chain. (ESSI Depo. Ex. 11; Hansen Depo. pp. 15–16; Rolf Depo. pp. 23–25). At 0600, when MERCEDES stopped her engine, ESSI again went ahead. (ESSI Depo. Ex. 11; Hansen Depo. pp. 15–16; Rolf Depo. pp. 23–25). Accordingly, there was no time either before or after the five-minute period when MERCEDES had its engine going astern, when there was no strain on the chain.

The NAIAD contends that the MERCEDES was negligent in going astern for five minutes at a critical time, thereby making collision with the NAIAD inevitable. The MERCEDES contends that the maneuver did little more than counteract some of the headway created by ESSI. The Court is of the opinion that even if the MERCEDES' going astern did result in pulling both vessels in an eastwardly direction and thus closer to the position of NAIAD, such a maneuver by MERCEDES does not establish fault on the part of the vessel. The Court FINDS that given the circumstances, the actions taken by the navigators of the MERCEDES to separate the two vessels were reasonable. Furthermore, the actions of MERCEDES were *in extremis,* and the vessel is therefore entitled to the benefit of any fair doubt regarding her actions. *Union Oil Co. v. Mary Malloy,* 414 F.2d at 674; *White Stack Towing Corp. v. Bethlehem Steel Co.,* 279 F.2d at 422.

The Court rejects the contention of the NAIAD that the MERCEDES was negligent for failing to drop her starboard anchor prior to 0625. The expert witness for the NAIAD, Captain Barry, testified that to drop a second anchor after a vessel has started to drag would be of no merit. (Tr. pp. 74–75). Further, the evidence has previously shown that the ESSI continued to drag after her second anchor was dropped.

In light of all of the surrounding circumstances, the Court is of the opinion that the actions taken by MERCEDES to avert further damage subsequent to the initial collision were reasonable. For the above stated reasons, the Court FINDS that the evidence fails to establish any fault on the part of MERCEDES either prior to or following the initial collision with the ESSI.

## THE NAIAD

The ESSI contends that the NAIAD was negligent in failing to take sufficient steps to avoid the collision with the MERCEDES. However, the Court FINDS that a review of the law and the evidence does not warrant such a conclusion. As previously noted, the NAIAD was properly anchored and did not drag prior to the collision with the MERCEDES. Therefore, the NAIAD is entitled to the privileged status of a safely anchored vessel. *Griffin, supra* at 371.

First, the ESSI contends that the NAIAD could have pulled in its anchor and moved out of the path of the two dragging vessels. However, a preponderance of the evidence indicates that such a maneuver would have been unwise given the time element involved and the existing weather, sea and anchorage conditions. (Tr. pp. 106, 107, 220, 221, 226, 227 and 233; Giannarakis Depo. 6–B, p. 14).

Next, the ESSI contends that if the NAIAD had slacked off its anchor chain before it steered to starboard, the collision would have been avoided. However, the Court is persuaded by and accepts the testimony of Captain Barry, the expert witness for the NAIAD. Captain Barry testified that the possibility that such a maneuver would have avoided the collision was questionable and would have been dangerous given the strain on the chain and the engines. (Tr. pp. 126–28). Moreover, the NAIAD did take evasive action prior to the collision.

The collision between the MERCEDES and the NAIAD was a close one, a matter of 30 or 40 meters. (Tr. p. 130, ESSI Brief

at 11). Also, the effect of MERCEDES going astern from 0555 to 0600 in an effort to jettison her chain possibly resulted in some eastward moving, thus drawing the MERCEDES closer to the NAIAD and eliminating the margin of safe passage which the NAIAD had created by maneuvering to starboard on her own anchor chain. (Tr. p. 130). The evidence shows that prior to the collision, the NAIAD had her main engine in operation, she maneuvered to avoid the drifting vessels, and she veered chain at a time the Captain determined was appropriate to allow the drifting vessels to pass clear. Furthermore, any errors in her judgment at this time must be judged leniently because she was placed in peril by the two vessels drifting down on her. *Union Oil Co. v. Mary Malloy, supra; White Stack Towing Corp. v. Bethlehem Steel Co., supra.*

■ In view of all of the circumstances, the Court is of the opinion that the Captain of the NAIAD did exhibit due care and maritime skill in his efforts to avoid collision. Therefore, the Court FINDS that the NAIAD was without fault which in any way contributed to the collisions on December 25, 1980.

In accordance with the above findings, the Court HOLDS that the ESSI is solely responsible in damages to the MERCEDES and to the NAIAD and their owners for all damages and losses sustained as a result of the collisions of December 25, 1980.

### Salvage Claim

■ The elements required to constitute a valid salvage claim are: a marine peril to the property to be rescued; voluntary service not owed to the property as a matter of duty; and success in saving the property or some portion of it from impending peril. *The Clarita and The Clara,* 90 U.S. (23 Wall) 1, 16, 23 L.Ed. 146, 150 (1874).

There is a sharp conflict in the testimony as to whether the MERCEDES was aground and required salvage services immediately following the collision with the NAIAD.

The NAIAD contends that by maneuvering her engines after the initial collision she was able to keep all three vessels in a safe place. (Brief for NAIAD at 13). The NAIAD contends that following the initial collision the vessels drifted to the south about forty-five hundredths (.45) of a mile to a position close to the nearby vessel NORRLAND. (Giannarakis Depo. 6–A, pp. 15, 26, 64 and 66; Malis Depo. p. 15; NAIAD Ex. 6). When it was observed that the vessels had drifted to this position at 0745, the NAIAD contends that the vessel went full ahead on her engines, thereby moving all three vessels in a northwardly direction back to a safer position. (Giannarakis Depo. pp. 15, 26, 64 and 66; Malis Depo. p. 15). It is the position of the NAIAD that at 0745 the MERCEDES was not aground. (Malis Depo. p. 25; Giannarakis Depo. 6–A, p. 64). NAIAD states that at 0800, to avoid further exposure of the ESSI and MERCEDES to peril, NAIAD passed two tension wires amidships across to MERCEDES, thereby holding the vessels together and stabilizing their position. (Brief for NAIAD at 13).

However, the ESSI and the MERCEDES contend that the NAIAD did not save the vessels from peril because the MERCEDES was aground at or immediately after the collision with the NAIAD. (Gonzalez Depo. pp. 30–32 and 71–72; Cobeaga Depo. p. 41). The vessels also contend that the wires were passed to MERCEDES to reduce scraping of the NAIAD against the side of the MERCEDES. (Brief for MERCEDES at 6; Brief for ESSI at 6). The Court FINDS that a preponderance of the evidence indicates that MERCEDES was aground at or immediately following the collision with NAIAD.

As previously noted, at the time of the collision between the NAIAD and the MERCEDES, the NAIAD was anchored in approximately 34–36 feet of water. The deep draft of MERCEDES was 37 feet. The MERCEDES was fully ballasted prior to the collisions on December 25. (Gonzalez Depo. pp. 30, 95 and 96). The NAIAD had a deep draft of about 24 feet. As the

MERCEDES approached the NAIAD, it passed over the anchor chain of NAIAD bending the anchor's fluke and stock and tearing a hole at the bottom of the bilge of the MERCEDES. (Tr. pp. 185–86 and 203–04). The hole in MERCEDES was estimated to be from four to twelve inches above the vessel's flat keel, thus indicating that MERCEDES was touching bottom or close to touching bottom at this time. (Tr. pp. 85 and 203–04). The Captain of the NAIAD stated that at the time of the collision with MERCEDES, his depth sounder showed that there was ten feet of water under his keel. (Giannarakis Depo. 80). This evidence together with the charted depth of the water indicate that MERCEDES was aground at this time (MERCEDES Ex. 1; ESSI Ex. 10). Although the NAIAD contends that the MERCEDES drifted about forty-five hundredths of a mile to the south following the initial collision, the charted depth of the water at this point was 34 feet, even less than the depth of the water at the point of collision. The Captain of the NAIAD stated that at 0745 when he went ahead on his engines, his depth sounder indicated that the water was approximately 32 feet in depth. (Giannarakis Depo. 6–A, p. 81).

The Court is of the opinion that the above evidence rebuts the claim of NAIAD that the vessels were in peril following the collision at 0626 and could not have been saved from further damage without its assistance. The Court FINDS that the MERCEDES was aground at or immediately following the collision with the NAIAD and thus not in danger of drifting further out of control and incurring further damage. Moreover, as ESSI was bound to the MERCEDES by the anchor chain, the ESSI was also out of danger of drifting further and incurring further damage. Accordingly, the Court FINDS that the NAIAD has failed to establish its entitlement to a salvage award.